# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

)
**SAMUEL JEWLER**, *et al.*       )
)
       **Plaintiffs,**       )
)   **C.A. No. 12-1843 (RWR)**
       **v.**       )
)
**DISTRICT OF COLUMBIA**, *et al.*,   )
)
       **Defendants.**       )
_____)

## MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT

Defendants District of Columbia ("District"), Metropolitan Police Department ("MPD") Chief of Police Cathy Lanier (in her official capacity only), Attorney General Irvin Nathan (in his official capacity only), Sergeant James Schaeffer, Officer Wen Ai, Officer Robert Wells, Officer Vene Lagon, Officer Andres Silva, Officer Michael Mentzer, Officer Oscar Garibay, Officer Stephen Franchak, Sergeant Steve Urps, Officer Tyrone Evans Freeman, Lieutenant Paul Niepling, Captain Robert Halbleib, Sergeant Johnnie Walter, Lieutenant Larry Scott, Lt. James McCoy, Captain Paul Shelton, Commander Michael Reese, Commander Steven Sund, and Eric Waldt (collectively, the "District Defendants"), by and through their undersigned counsel and pursuant to Fed. R. Civ. P. 12(b)(1) and (6), respectfully request that the Court dismiss this matter. As explained more fully herein, Plaintiffs have failed to state any claim against the District Defendants upon which relief can be granted, and the District Defendants are entitled to judgment as a matter of law.

Because this motion is dispositive in nature, LCvR 7(m) is inapplicable.

Respectfully submitted,

IRVIN B. NATHAN
Attorney General for the District of Columbia

ELLEN A. EFROS
Deputy Attorney General, Public Interest Division

*/s/* Melissa L. Baker
MELISSA L. BAKER (499368)
Acting Section Chief, Equity Section

/s/  Shana L. Frost_____
SHANA L. FROST (458021)
Assistant Attorney General
441 4th Street, NW
Washington, DC 20001
(202) 724-6534
Fax:  (202) 741-8934
shana.frost@dc.gov

/s/ Matthew R. Blecher
MATTHEW R. BLECHER [admitted to the
District of Columbia Bar; Bar Number
pending]
Assistant Attorney General
Equity Section, Public Interest Division
441 Fourth Street, N.W., Suite 600S
Washington, D.C. 20001
Phone: (202) 442-9774
Fax:  (202) 730-0586
Email: matthew.blecher@dc.gov


**CERTIFICATE OF SERVICE**

I hereby certify that on this 8th day of March, 2013, I caused the foregoing Motion to be filed with the Clerk of the U.S. District Court for the District of Columbia using the Court's ECF, which will electronically serve copies of the same on counsel for all parties.

____/s/ Shana L. Frost_____
Shana L. Frost
Assistant Attorney General

_____
)
**SAMUEL JEWLER,** *et al.*                )
                                             )
      **Plaintiffs,**              )
                                             )          **C.A. No. 12-1843 (RWR)**
    **v.**                           )
                                             )
**DISTRICT OF COLUMBIA,** *et al.,*        )
                                             )
    **Defendants.**                )
_____)

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

### PROCEDURAL AND FACTUAL BACKGROUND

Plaintiffs Samuel Jewler, Brennan McFarlane, Jr., Antonya Huntenburg, Barry Knight, Timothy Pilar, Marshall Scott, Brian Eister, Tracey Johnstone, Justine Mark, Harris Ntabakos, and Rodolfo Roberts are members of Occupy DC, which is part of the larger Occupy movement. Am. Compl. ¶ 45.[1] Plaintiffs describe the purpose of the Occupy movement as "seek[ing] to expose how the wealthiest 1% of society are promulgating an unfair global economy that is harming people, and destroying communities worldwide." *Id.* ¶ 46. "A key purpose of the Occupy Movement is to raise awareness about the abuse of power and lack of accountability on the part of large financial institutions." *Id.* 47.

Plaintiffs also describe their "physical presence in public space" as a "key component" of their political statement and petitioning conduct. *Id.* ¶ 48. In that regard, Plaintiffs began daily

---

[1] Defendants are the District of Columbia, Chief of Police Cathy Lanier (in her official capacity only), Attorney General Irvin Nathan (in his official capacity only), Sergeant James Schaeffer, Officer Wen Ai, Officer Robert Wells, Officer Vene Lagon, Officer Andres Silva, Officer Michael Mentzer, Officer Oscar Garibay, Officer Stephen Franchak, Sergeant Steve Urps, Officer Tyrone Evans Freeman, Lieutenant Paul Niepling, Captain Robert Hableib, Sergeant Johnnie Walter, Lieutenant Larry Scott, Lieutenant James McCoy, Captain Paul Shelton, Commander Michael Reese, Commander Steven Sund, and Eric Waldt (the "District Defendants"), Bank of America, NA and Joseph Massey (the "Bank of America Defendants"); The John Akridge Co., Philip J. McGovern, Kathleen McKeon, and Judy Oakley (the "Akridge Defendants").

protests in front of Bank of America, located at 1090 Vermont Avenue, NW, beginning on or about April 4, 2012. *Id.* ¶ 49. Plaintiffs contend that this location was chosen to "begin an ongoing discussion about reforming banking and financial institutions and removing special interests from government." *Id.* ¶ 51. Plaintiffs further contend that the location was "fundamental" to their message: "Locating the demonstration there communicates a message about the object of their protest, and that message could not be communicated as effectively in another location." *Id.* ¶ 52. Specifically, Plaintiffs protested what they believed to be Bank of America's unfair foreclosure on people's homes and their refusal to give loan modifications. *Id.* ¶ 53.

"The protest outside Bank of America came to be called a 'sleepful protest' by many Occupy members because some of the participants slept on the sidewalk outside Bank of America overnight and/or remained in sleeping bags during the day." Am. Compl. ¶ 54. Indeed, Plaintiffs aver that their sleeping bags were "in part symbolic and in part facilitative of other speech activities." *Id.* ¶ 55. "By sleeping and/or being in a sleeping bag, the protestors were expressing their message that individuals who were being evicted from their homes by Bank of America had nowhere to go. They sought to bring the problem of homelessness to Bank of America's 'doorstep,' so to speak." *Id.* ¶ 57. Many protestors also believed that it was illegal to sleep in McPherson Square, but legal to sleep on the local District sidewalks. "Thus, many individuals who wished to be in McPherson Square on a continuing basis moved to the sidewalk to sleep at night." *Id.* ¶ 58. Plaintiffs assert that although their complaint refers to their demonstration as a "sleepful protest," "none of the Plaintiffs were sleeping or attempting to sleep at the time they were arrested." *Id.* ¶ 59.[2]

---

[2] The area where the "sleepful protest" took place was on the western sidewalk of Vermont Avenue, NW between K Street and Thomas Circle. Am. Compl. ¶ 60. In their amended complaint, Plaintiffs include many factual

Plaintiffs contend that Defendant Joseph Massey, a retired MPD officer employed by Bank of America, discussed plans with Defendant Lieutenant Larry Scott in early April, 2012, to illegally arrest the protestors in front of Bank of America, despite the fact that neither believed that the Plaintiffs had committed or would in the future commit, any crime.  Am. Compl. ¶¶ 76-79.  Plaintiffs contend that Lt. Scott discussed potential arrests with his superiors, Commander Steve Sund and Captain Paul Shelton, as well as unidentified attorneys from the Office of the Attorney General.  *Id.* ¶¶ 81-82.  They allege that "the attorneys advised that the Blocking Passage law could be properly applied to arrest protesters who were 'blocking' a sidewalk simply by sitting on the ground, no matter how small a percentage of the sidewalk they took up or how much space pedestrians had to maneuver around them."  *Id.* ¶ 83.

Plaintiffs contend that, thereafter, Massey and Lt. Scott met with the Akridge Defendants where they conspired to violate the Plaintiffs' constitutional rights by means of an agreement where Lt. Scott would give a dispersal order and then have his officers arrest any protesters that did not leave, regardless of whether they were breaking the law.  Am. Compl. ¶¶ 84-85.  Plaintiffs contend that, Lt. Scott, "in furtherance of the conspiracy, gave the protesters an order to disperse.  The protesters who did not leave were arrested."  *Id.* ¶ 86.  They allege that the scenario repeated itself over the next three days.  *Id.*  Specifically, Plaintiffs assert that (1) Plaintiffs Ntabakos and Roberts were arrested on April 10, 2012 by Officers Wells and Evans Freeman upon orders by Sgt. Urps, after a dispersal order given by Lt. Scott (Am. Compl. ¶¶ 88-109); (2) Plaintiffs Pilar, Huntenburg, and Knight were arrested on April 11, 2012 by Officers

_____

allegations pertaining to alleged recommendations for sidewalk width for purposes of accessibility.  Am Compl. ¶¶ 62-71.

Franchak, Mentzer and Matthew Brinkley,[3] upon orders by Sgt. Urps, after a dispersal order was given by Lt. Scott on the instructions of Capt. Halbleib and Lt. Niepling after conferring with Sgt. Walter (Am. Compl. ¶¶ 110-140);[4] (3) Plaintiff Mark was arrested by Officer Silva on April 12, 2012 after dispersal orders were given by Lt. McCoy (Am. Compl. ¶¶ 141-156); and (4) Plaintiffs Jewler, Scott, Eister, Johnstone, and McFarlane were arrested by Sergeant Schaeffer and Officers Ai, Wells, Lagon, and Garibay on April 13, 2012 after dispersal orders were given. Am. Compl. ¶¶ 157-179. Plaintiffs were issued citations; the charges against Plaintiffs Ntabakos and Roberts were dismissed for want of prosecution, and the arrests of Plaintiffs Pilar, Huntenburg, Knight, Jewler, Scott, Eister, Johnstone, Mark and McFarlane were no papered. Am. Compl. ¶¶ 180-83. Thus, Plaintiffs claim that the arresting officers, as well as the officials giving arrest and dispersal orders, are liable under the First and Fourth Amendments, as well as for common law false arrest and imprisonment.

Plaintiffs also claim that the District was deliberately indifferent to a need to train its officers regarding enforcement of the Blocking Passage law in a manner that does not infringe upon the First Amendment. Plaintiffs claim that a 2003 report issued by the Office of Police Complaints, as well as a 2010 Council for Court Excellence report, City Council hearings addressing amendments to the District's disorderly conduct statute, and an incident involving a street musician arrested at the intersection of M Street and Wisconsin Avenue in Georgetown, provided the District constructive notice of constitutional violations. Am. Compl. ¶¶ 184-207.

---

[3] Former MPD officer Matthew Brinkley originally was named as a Defendant, but was voluntarily dismissed by Plaintiffs shortly before an amended complaint was filed, notwithstanding the fact that Brinkley remained an arresting officer.

[4] Plaintiffs also contend that, after the April 11 arrests were made, Sgt. Walter edited a narrative drafted by Officer Franchak for use in the arrest report to "falsely state that the arrestees had been blocking the entrance to the bank." Am. Compl. ¶ 137. They further state that Officer Franchak rewrote the narrative to delete the erroneous statement. *Id.* ¶ 138. Plaintiffs also contend that Capt. Shelton advised the officers that he would take full responsibility for the arrests. *Id.* ¶ 140.

They assert that "it was necessary to train all officers that the Blocking Passage law was not an anti-loitering ordinance, that officers could only order individuals to cease blocking and not to leave the area completely, that partial blocking was not illegal, and that orders could not be issued that would violate individuals' First Amendment rights."  Am. Compl. ¶ 207.  They therefore assert common law claims of negligent training and supervision, and constitutional claims for deliberate indifference to a need to train against the District, Defendant Waldt, Commander Sund (as supervisor of the SOD), and Commander Reese (as supervisor of the Second District).

In addition to the claims for failure to train, Plaintiffs contend that the Blocking Passage law itself is unconstitutional.  Specifically, they allege that "[t]he terms 'crowd,' 'obstruct,' and 'incommode' are undefined in the Blocking Passage law" and thus "fail to provide the notice due process demands so that citizens may shape their behavior in compliance with legal norms." Am. Compl. ¶¶ 225-226.  Plaintiffs further contend that "[t]he undefined terms are also so broad as to criminalize a substantial amount of First Amendment protected activity" and that the statute's vagueness and overbreadth "has led many law enforcement officials viewing it as a general anti-loitering ordinance and enforcing it as such."  *Id.* ¶¶ 227-28.  Plaintiffs assert the statute is unconstitutional both on its face and as applied, and, alternatively, its "widespread misapplication…is itself a violation of the First and Fourth Amendments."  *Id.* ¶¶ 229-30.

Plaintiffs assert the following common law claims:  (1) a claim of false arrest and imprisonment against their arresting officers (and the officials ordering their arrests) Am. Compl. ¶¶ 233-252; (2) a claim of abuse of process against Lt. Scott, Capt. Shelton, Cmdr. Sund, and the non-District individual defendants, *Id.* ¶¶ 254-260; and (3) negligent training and supervision against Defendant Waldt, Cmdr. Sund, and Cmdr. Reese, *Id.* ¶¶ 261-268.  Plaintiffs also assert

constitutional claims under the First and Fourth Amendment: against the arresting officers and the officials that ordered the arrests, Am. Compl. ¶¶ 270-287, 299-314, (2) against the District for maintaining an unconstitutional custom, policy or practice, *Id.* ¶¶ 288, 296-97, 317, 333; (3) against the District, Defendant Waldt, Cmdr. Reese, and Cmdr. Sund for deliberate indifference to the need to properly train and supervise MPD employees regarding the proper application of the Blocking Passage statute, *Id.* ¶¶ 288-93, 318-322. They also bring a Fifth Amendment Equal Protection claim against all the individual defendants for the alleged conspiracy to violate their constitutional rights. *Id.* ¶¶ 324-331. Finally, Plaintiffs seek to enjoin Chief Lanier and Attorney General Nathan from enforcing the Blocking Passage law. *Id.* ¶¶ 335-337.

## STANDARD OF REVIEW

To survive a motion to dismiss, a plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atl. Corp. v. Twombly,* 550 U.S. 554, 555 (2007). The Supreme Court has established a "two-pronged approach" that a trial court should utilize when ruling on a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6). *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While a trial court generally must consider a plaintiff's factual allegations as true, the court should first "identify pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* Thus, the basic pleading standards "demand more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (citing *Twombly*, 550 U.S. at 555).

Once the court has determined that the plaintiff has asserted "well-pleaded factual allegations," it "should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* The Court defined "plausible" as follows:

> A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.

*Id.; see also Atherton v. District of Columbia*, 567 F.3d 672, 681 (D.C. Cir. 2009) (quoting passage with approval). In other words, a plaintiff's factual allegations must allow a court to draw a reasonable inference that the defendant is liable for the misconduct alleged, if the factual allegations are proven true. *See Matrixx Industries, Inc. v. Siracusano*, 131 S. Ct. 1309, 1323 (2011).

## ARGUMENT

### I. The Blocking Passage Law Is Constitutional

#### A. Overview of the Statute and Plaintiffs' Arguments

The Blocking Passage statute, which is a segment of the District's disorderly conduct laws, provides as follows:

> It is unlawful for a person, alone or in concert with others, to crowd, obstruct, or incommode the use of any street, avenue, alley, road, highway, or sidewalk, or the entrance of any public or private building or enclosure or the use of or passage through any public conveyance, and to continue or resume the crowding, obstructing, or incommoding after being instructed by a law enforcement officer to cease the crowding, obstructing, or incommoding. A person who violates any provision of this section shall be guilty of a misdemeanor and, upon conviction, shall be fined not more than $500, imprisoned for not more than 90 days, or both.

D.C. Code 22-1307.[5]

The current version of the statute is the result of amendments made by the D.C. City Council that became effective in May, 2011.[6] The purpose of the amendments was twofold: to "enable the true intent of disorderly conduct laws" by retaining the statute's simplistic focus on the unlawful activity, while removing portions deemed vague. Committee on Public Safety and the Judiciary, Committee Report at 2; 6; *see also* Natwar M. Gandhi, Memorandum in re Fiscal Impact Statement – *Disorderly Conduct Amendment Act of 2010*, Government of the District of Columbia Office of the Chief Financial Officer (Nov. 18, 2010).[7] Thus, with the goal of making the statute "easily understood and uncomplicated to enforce," the amendments specifically retained the phrase "crowd, obstruct, or incommode," "because it preserves phrasing in the current law" which had been construed by the D.C. Court of Appeals as constitutional. Committee Report at 6 & Letter from Patricia A. Riley, Special Counsel to the United States Attorney, to Phil Mendelson, Chairman, Committee on Public Safety and the Judiciary (Oct. 22, 2009) (attached to Committee Report). In the same vein, the amendments removed "terms that are vague and difficult to define, such as 'annoy' and 'congregate.'" *Id.* at 2.

As stated, Plaintiffs attempt to mount a multi-faceted challenge to the Blocking Passage law. First, they assert a facial challenge, arguing that the statute is overbroad, claiming (1) the

---

[5] Amendments to this law were approved by the Council on January 14, 2013. *See* Omnibus Criminal Code Amendments Emergency Act of 2012, Act 19-599.

[6] The prior version of the statute read as follows:

> It shall not be lawful for any person or persons within the District of Columbia to congregate and assemble in any street, avenue, alley, road, or highway, or in or around any public building or enclosure, or any park or reservation, or at the entrance of any private building or enclosure, to crowd, obstruct, or incommode, the free use of any such street, avenue, alley, road, highway, or any of the foot pavements thereof, or the free entrance into any public or private building or enclosure under a penalty of not more than $1,000 or imprisonment for not more than 90 days, or both for each and every such offense.

[7] These reports and comments are part of the legislative history of the statute, as are the documents that Plaintiffs reference in their amended complaint. *See* Am. Compl. ¶¶ 184-191.

statute's use of the terms "crowd," "obstruct," and "incommode," without definition, is unconstitutionally vague; and (2) the statute provides "unfettered discretion to law enforcement to determine precisely how much crowding, obstructing, or incommoding triggers the statute," and criminalizes a substantial amount of First Amendment activity." Am. Compl. ¶ 225-27. Second, they assert an as-applied challenge. *Id.* ¶¶ 229; 335. Finally, they contend that, even if the statute was constitutional, "the widespread misapplication of the statute is itself a violation of the First and Fifth Amendments." *Id.* ¶¶ 229-30. As explained below, none of Plaintiffs' constitutional challenges to the blocking passage law have merit. Because Plaintiffs cannot demonstrate that the law is facially unconstitutional, they are not entitled to equitable relief on these claims, nor can they prevail on their claims that the statute as applied to them violated their constitutional rights.

### B. Plaintiffs Cannot Prevail on Their Facial Challenge to the Blocking Passage Law

"Facial challenges are strong medicine." *Ward v. Utah*, 398 F.3d 1239, 1246 (10th Cir. 2005). The Supreme Court has noted that "facial challenges are best when infrequent…. Although passing on the validity of a law wholesale may be efficient in the abstract, any gain is offset by losing the lessons taught by the particular, to which common law method normally looks." *Sabri v. United States*, 541 U.S. 600, 608-09 (2004) (citations omitted). Thus, striking down a statute as overbroad is a "'drastic' remedy" to be used "sparingly." *United States v. Bader*, 698 F.2d 553, 556 (1st Cir. 1983). In fact, "[a]ccording to the Supreme Court, a court may hear an overbreadth challenge only when the risk that the statute will prevent protected speech is 'not only…real, but *substantial* as well, judged in relation to the statute's plainly legitimate sweep.'" *Id.* (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973)) (emphasis added); *see also Ward*, 398 F.3d at 1247 ("Because facial challenges push the judiciary towards

the edge of its traditional purview and expertise, courts must be vigilant in applying a most exacting analysis to such claims"). Thus, facial overbreadth adjudication is not appropriate where the regulated conduct is not "pure speech." *See United States v. Shiel*, 611 F.2d 526, 527 (4th Cir. 1979) (relying on *Broadrick* for the proposition that "overbreadth attacks on statutes based on First Amendment grounds are not appropriate where conduct other than 'pure speech' is involved."); *accord Hastings v. Judicial Conf. of U.S.*, 829 F.2d 91, 106 (D.C. Cir. 1987) (rejecting overbreadth challenge where the "statute, by its terms, regulate[d] 'conduct'" not speech).

Here, pure speech is not involved. Rather, the Blocking Passage law prohibits conduct that has the effect of making travel down a street or sidewalk difficult for others; any effect the statute has on protected speech is incidental. Thus, it is different in scope and nature than, for example, the city ordinance at issue in *City of Lakewood v. Plain Dealer Pub. Co.*, that required a newspaper to apply annually for news rack licenses. 486 U.S. 750, 759 (1988). The Court found that the ordinance was directed "narrowly and specifically" at conduct associated with protected expression, namely the "circulation of newspapers." *Id.* at 760. In *Forsyth County v. Nationalist Movement*, the challenged ordinance required a fee to be paid "before authorizing public speaking, parades, or assemblies" on public property, including streets. 505 U.S. 123, 130 (1992). In both cited examples, the laws at issue had a clear, direct nexus to First Amendment activity, and facial overbreadth adjudication was thus acceptable. *Accord Thomas v. Chicago Park Dist.*, 534 U.S. 316 (2002) (ordinance requiring a permit before conducting large-scale assemblies in a public park). By contrast, the District's blocking passage statute has no obvious nexus to protected expression. Unlike the ordinances in *Thomas* and *Forsyth County*, which specifically addressed assembly for the purpose of First Amendment activity, the statute at issue

here governs all types of movement upon public ways, regardless of whether the movement is accompanied by expressive activity. Based on the foregoing, the Blocking Passage law is not directed at "pure speech," and Plaintiffs may not maintain their facial challenge.

### 1. The Statute Is Not Overbroad

Even if a facial challenge is available, Plaintiffs cannot prevail on their claims that the blocking passage law is overbroad or vague. In determining whether a statute is overbroad, the Court's "first task is to determine whether the enactment reaches a substantial amount of constitutionally protected conduct." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494 (1982). Where, like here, the statute regulates conduct and not "pure speech," the Court must also take into account the District's legitimate interest in enforcing otherwise valid criminal laws. *Broadrick*, 413 U.S. at 615. Moreover, where the regulation is "'a valid law dealing with conduct subject to regulation so as to vindicate important interests of society[,]…the fact that free speech is intermingled with such conduct does not bring with it constitutional protection.'" *Cameron v. Johnson*, 390 U.S. 611, 617 (1968) (quoting *Cox v. State of Louisiana*, 379 U.S. 559, 564 (1965)). Even where a regulation may chill protected activity, "there comes a point where that effect – at best a prediction – cannot, with confidence, justify invalidating a statute on its face and so prohibiting [the District] from enforcing the statute against conduct that is admittedly within its power to proscribe." *Broadrick*, 413 U.S. at 615.

Plaintiffs argue that the blocking passage law is overbroad because it criminalizes more First Amendment activity than necessary. But, "[a]s is clear from *Broadrick*, a court should not invalidate a statute on its face simply because the statute may criminalize some protected speech." *Ward*, 398 F.3d at 1247. Instead the Court must examine the statute to determine its "plainly legitimate sweep" in order to determine how much protected speech is impacted. *Id.*

The District's law, like the disorderly conduct regulations at issue in *Bader*, "is not aimed at speech but, rather, at ordinary conduct legitimately subject to regulation." *Bader*, 698 F.2d at 556; *see also Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949) ("it has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed.").[8] Although First Amendment expression might conceivably take place while the speaker is crowding, obstructing, or incommoding on a public sidewalk, the law itself is not directed at the expression, but rather to anyone blocking passage on the sidewalk. As such, the threat to expression is not substantial in relation to the legitimate sweep of the statute in ensuring free passage on the District's streets and sidewalks and the statute therefore cannot be deemed overbroad. *Broadrick*, 413 U.S. at 615; *Bader*, 698 F.2d at 556.

## 2. The Statute Is Not Vague

A law is unconstitutionally vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Stagliano*, 693 F. Supp. 2d 25, 35 (D.D.C. 2010) (quoting *United States v. Williams*, 553 U.S. 285, 304 (2008)). Moreover, "a law is unconstitutionally vague on its face only if it is 'impermissibly vague in all its applications.'" *Kadi v. Geithner*, 2012 WL 898778 at * 32 (D.D.C. Mar. 19, 2012) (quoting *Hoffman Estates*, 455 U.S. at 497). For the reasons set forth below, the Blocking Passage law is neither unconstitutionally standardless nor vague in all applications.

---

[8] The regulations at issue in *Bader* required that persons on federal property "at all times comply with official signs of a prohibitory, regulatory, or directive nature and with the direction of Federal protective officers and other authorized individuals." 41 C.F.R. Sec. 101-20.304 (1980). A second regulation, similar to that at issue here, prohibited *inter alia* conduct "which unreasonably obstructs the usual use of entrances, foyers, lobbies, corridors, offices, elevators, stairways, or parking lots" or "impedes or disrupts the performance of official duties by Government employees…" 41 C.F.R. Sec. 101-20.305 (1980). The First Circuit, per then Circuit Judge Breyer, unanimously upheld the constitutionality of both provisions. *See Bader*, 698 F.2d at 555-57.

Plaintiffs first contend that the phrases "crowd," "obstruct," and "incommode" are undefined, and "so vague as to fail to provide the notice due process demands so that citizens may shape their behavior in compliance with legal norms." Am. Compl. ¶¶ 225-26. But "common words, when given their plain and ordinary meanings, do not need to be exhaustively defined, or even defined at all within a given regulation, to survive a challenge for vagueness." *Wag More Dogs, LLC v. Artman*, 795 F. Supp. 2d 377, 388 (E.D. Va. 2011) (citing *Imaginary Images, Inc. v. Evans*, 612 F.3d 736, 749 (4th Cir. 2010)). Language, rather, "is unavoidably inexact," and, even in a First Amendment challenge, regulations "cannot, in reason, define proscribed behavior exhaustively or with consummate precision." *United States v. Thomas*, 864 F.2d 188, 195 (D.C. Cir. 1988) (citing *Young v. Community Nutrition Inst.*, 476 U.S. 974 (1986)). Accordingly, the law must only be sufficiently specific to give a reasonably prudent person adequate notice of prohibited conduct. *Freeman United Coal Mining Co. v. Fed'l Mine Safety & Health Review Comm'n*, 108 F.3d 358, 362 (D.C. Cir. 1997) (citing *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972)).

Here, all the complained-of terms in the blocking passage law – obstruct, crowd, and incommode – have been either expressly found to be clear, or are sufficiently similar to words expressly found to be clear so as to defeat any challenge on vagueness grounds. In *Cameron v. Johnson*, the Court upheld a statute that made it unlawful for a person, alone or in concert to, *inter alia*, "obstruct or unreasonably interfere with free use of public streets, sidewalks, or other public ways…." The Court found that the "terms obstruct and unreasonably interfere plainly require no guessing at their meaning." *Cameron*, 390 U.S. at 616. Thus, the Court "conclude[d] that the statute clearly and precisely delineate[d] its reach in words of common understanding." *Id.; see also Hoffman v. Hunt*, 126 F.3d 575, 581 (4th Cir. 1997) (holding that the terms *obstruct*

and *block* "do not require those subject to the statute [prohibiting blocking of access to a health care clinic] to guess at their meaning.").

Defendants have not found any case in which a court has determined that the term "crowd," when used as a verb, is vague, but the D.C. Court of Appeals' application of the term "incommode," as used in D.C. Code § 22-1307, supports the conclusion that its plain meaning is not vague or difficult to understand. *See Tetaz v. District of Columbia*, 976 A.2d 907, 918-19 (D.C. 2009) (Ruiz, J. dissenting) (noting the "[t]he judge found that the appellants' protest clearly block[ed] a series of doors [on the Independence Avenue side of the Rayburn Building], 70 percent, even though it doesn't physically prevent anyone from walking in, *does incommode*.") (emphasis added). Similarly, the local court's use of the terms *obstruct*, *crowd*, and *incommode* in their discussions of the statute supports that their meanings are plain and clear. *See, e.g, Adams v. United States*, 256 A.2d 563, 564-65 (D.C. 1969). Thus, the District's Blocking Passage law puts a reasonable person on notice of what specific requirements apply to movement on a public sidewalk—compliance turns entirely on easily understood, objective elements. In short, an ordinary person exercising ordinary common sense can understand and comply with the District's Blocking Passage law.

The statute also provides reasonable guidance for law enforcement. While a law may be found to be void for vagueness where it is susceptible to arbitrary or discriminatory enforcement, courts will not find a statute vague simply because it requires law enforcement to use some degree of judgment. *See Grayned*, 408 U.S. at 114. The fact that a law allows discretion in its enforcement does not mean that the "speaker may challenge as censorship any law involving discretion to which it is subject." *City of Lakewood*, 486 U.S. at 759. Instead, the challenged law "must have a close enough nexus to expression, or to conduct commonly associated with

expression, to pose a real and substantial threat of the identified censorship risks." *Id.* Here, an arrest may only be made where an individual is crowding, obstructing, or incommoding, and the individual refuses to stop crowding, obstructing, or incommoding, after being advised to do so. As the effective language of the statute is clear on its face, *see supra*, the statute is necessarily unambiguous for law enforcement purposes as well.[9]

### C.   Plaintiffs Cannot Prevail on Their As-Applied Challenge

Plaintiffs' as-applied challenge also fails as the blocking passage law was applied constitutionally to the Plaintiffs as a reasonable time, place and manner restriction. "'The privilege of a citizen of the United States to use [public space] for communication of views on national questions may be regulated in the interest of all . . . .'" *White House Vigil for the ERA Comm. v. Clark*, 746 F.2d 1518, 1526 n.66 (D.C. Cir. 1984) (quoting *Hague v. CIO*, 307 U.S. 496, 515 (1939) (Roberts, J., concurring)). *See also, e.g., Heffron v. Int'l Soc'y for Krishna Consciousness*, 452 U.S. 640, 647 (1981) ("the First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired.") (citations omitted). Thus, there should be no question that First Amendment expression can be subject to some degree of governmental regulation. *See, e.g., Cox v. Louisiana*, 379 U.S. 559, 563 (1965) ("picketing and parading" are "subject to regulation even though intertwined with expression and association"). In determining whether a governmental restriction is permissible

---

[9] Additionally, because a finding of facial overbreadth is "employed by the Court sparingly and only as a last resort," it will not be "invoked when a limiting construction has been or could be placed on the challenged statute." *Broadrick*, 413 U.S. at 613. Thus, to the extent the Court deems that the statute allows too much discretion in enforcement, the Court could imply a limit on its construction that would require a law enforcement officer to have probable cause that other individuals actually were crowded, blocked, or incommoded. *Cf. Shuttlesworth v. City of Birmingham*, 382 U.S. 87, 91 (1965) (upholding constitutionality of state statute that prohibited "any person or any number of persons to so stand, loiter or walk upon any street or sidewalk in the city as to obstruct free passage over, on or along said street or sidewalk," or to do the same after being requested by a police officer to move along, where the state supreme court "authoritatively ruled that [the regulation] applies only when a person who stands, loiters, or walks on a street of sidewalk so as to obstruct free passage refuses to obey a request by an officer to move on." The Court found that with such a construction, it could not "say that the ordinance is unconstitutional though it requires no great feat of imagination to envisage situations in which such an ordinance might be unconstitutionally applied.").

under the First Amendment our Circuit utilizes a three-part test:  "first, determining whether the First Amendment protects the speech at issue, then identifying the nature of the forum, and finally assessing whether the [ ] justifications for restricting [the] speech 'satisfy the requisite standard.'"  *Mahoney v. Doe,* 642 F.3d 1112, 1116 (D.C. Cir. 2011) (quoting *Cornelius v. NAACP Legal Defense & Ed. Fund, Inc.*, 473 U.S. 788, 797 (1985)).

For purposes of this Motion only, Defendants do not dispute that Plaintiffs' "Occupy" activity may be deemed expressive activity protected by the First Amendment or that a sidewalk constitutes a traditional public forum.[10]  These acknowledgments, however, "only begin[] the inquiry" as it is very well-settled that expressive First Amendment activity in a traditional public forum is properly subject to reasonable time, place and manner restrictions, such as those imposed on Plaintiffs here.  *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 293 (1984).  In determining whether a restriction on First Amendment expressive activity is permissible, courts examine whether the restriction is content-based or content-neutral.  Content-based restrictions presumptively violate the First Amendment, *see City of Renton v. Playtime Theaters, Inc.*, 475 U.S. 41, 46 (1986), whereas the government may impose content-neutral regulations that "are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication."  *Perry Educ. Assn. v. Perry Local Educators' Assn.*, 460 U.S. 37, 45 (1983).

### 1. The Blocking Passage statute is content-neutral.

"Government regulation of expressive activity is content neutral so long as it is 'justified without reference to the content of the regulated speech.'"  *Ward v. Rock Against Racism*, 491

---

[10] *See, e.g., Mitchell v. City of New Haven*, 854 F. Supp. 2d 238, 246-47 (D. Conn. 2012) (finding the participants in Occupy New Haven to be engaged in expressive activity protected by the First Amendment) and *Snyder v. Phelps*, 131 S. Ct. 1207, 1218 (2011) ("'[W]e have repeatedly referred to public streets as the archetype of a traditional public forum,' noting that '[t]ime out of mind' public streets and sidewalks have been used for public assembly and debate.") (quoting *Frisby v. Schultz*, 487 U.S. 474, 480 (1988)).

U.S. 781, 798 (1989) (quoting *Clark*, 468 U.S. at 293). "The principal inquiry in determining content neutrality . . . is whether the government has adopted a regulation of speech because of a disagreement with the message it conveys." *Hill v. Colorado*, 530 U.S. 703, 719 (2000) (quoting *Ward*, 491 U.S. at 791)); *see also City of Los Angeles v. Alameda Brooks, Inc.*, 535 U.S. 425, 448 (2002) (Kennedy, J., concurring) ("[W]hether a statute is content neutral or content based is something that can be determined on the face of it.").

Here, Plaintiffs have pled no facts to establish, or even infer, that the District promulgated the Blocking Passage law because it seeks to suppress (or disagrees with) any particular message or speech content. The statute does not "by [its] terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed." *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 643 (1994); *see also ISKCON of Potomac, Inc. v. Kennedy*, 61 F.3d 949, 955 (D.C. Cir. 1995) (regulation "does not as [plaintiff] contends, totally prohibit a type of expression or a specific message; rather it merely regulates the manner in which the message may be conveyed."). Thus, the statute is content-neutral. *See Turner*, 512 U.S. at 645 (holding that rules that distinguish "based only upon the manner in which speakers transmit their messages to viewers, and not upon the messages they carry" are content-neutral); *Henderson v. Lujan*, 964 F.2d 1179, 1183 (D.C. Cir. 1992) ("As the regulation on its face makes no content distinction . . . it appears to be a genuine regulation of time, place or manner.").[11] Accordingly, the restriction is permissible "[s]o long as the means chosen are not substantially broader than necessary to achieve the government's interest." *Ward*, 491 U.S. at 800.

---

[11] *See also Christian Legal Soc. Ch. of the Univ. of Cal. v. Martinez*, 130 S.Ct. 2971, 2994 (2010) ("[a] regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others.") (quoting *Ward*, 491 U.S. at 791).

### 2. The Blocking Passage Statute Is Narrowly Tailored and Serves a Significant Government Interest

The District has a significant interest in keeping the public sidewalks open for the safe use and enjoyment by all people. *See Bery v. City of New York*, 97 F.3d 689, 697 (2d Cir. 1996) (noting that the government "certainly has a significant interest in keeping its public spaces safe and free of congestion."). Indeed, "[r]egulation of the use of a public forum that ensures the safety and convenience of the people is not 'inconsistent with civil liberties but … [is] one of the means of safeguarding good order upon which [civil liberties] ultimately depend.'" *Thomas*, 534 U.S. at 323 (quoting *Cox v. New Hampshire*, 312 U.S. 569, 574 (1941)). *See also Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 507–508 (1981) ("traffic safety and the appearance of the city[ ] are substantial governmental goals.") (plurality op.). This type of government regulation is permitted specifically in the First Amendment context:

> The rights of free speech and assembly, while fundamental in our democratic society, still do not mean that everyone with opinions or beliefs to express may address a group at any public place and at any time. The constitutional guarantee of liberty implies the existence of an organized society maintaining public order, without which liberty itself would be lost in the excesses of anarchy. The control of travel on the streets is a clear example of governmental responsibility to insure this necessary order. A restriction in that relation, designed to promote the public convenience in the interest of all, and not susceptible to abuses of discriminatory application, cannot be disregarded by the attempted exercise of some civil right which, in other circumstances, would be entitled to protection.

*Cox*, 379 U.S. at 554; *see also id.* at 554-55 ("Governmental authorities have the duty and responsibility to keep their streets open and available for movement.") Thus, the significance of the governmental interest is established.

In order to be narrowly tailored, a regulation "need not be the least restrictive or least intrusive means" of furthering the governmental interest. *Ward*, 491 U.S. at 798. "Rather, the requirement of narrow tailoring is satisfied 'so long as the . . . regulation promotes a substantial

government interest that would be achieved less effectively absent the regulation.'" *Id.* at 799

(quoting *United States v. Albertini*, 472 U.S. 675, 689 (1985)). Moreover, "the regulation will

not be invalid simply because a court concludes that the government's interest could be

adequately served by some less-speech-restrictive alternative." *Id.* at 800.

The District's blocking passage law furthers the governmental interest by prohibiting

individuals from obstructing (or crowding or incommoding) public streets and sidewalks or

entrances to buildings. The regulation ensures that the government may keep public

passageways accessible for everyone. Absent such a regulation, the government would be less

able to ensure the equal and safe use of sidewalks and streets for all persons seeking to use them

as there would be no disincentive to individuals to cease blocking or incommoding. *See, e.g.,*

*White v. City of Laguna Beach*, 679 F. Supp. 2d 1143, 1153 (C.D. Cal. 2010) ("the goal of

promoting the free flow of traffic on the sidewalk would be achieved less effectively in the

absence of the enforcement of [the regulation], as the demonstrators would have no disincentive

from continuing to block the sidewalk and obstruct pedestrian traffic.").[12] The regulation thus

promotes a substantial governmental interest that would be achieved less effectively in its

absence.

### 3. Plaintiffs Were Permitted Ample Alternative Channels of Communication.

Plaintiffs also cannot dispute that they had ample alternative channels of communication

open to them. Plaintiffs acknowledge that "members of Occupy DC began daily protests in front

of Bank of America" beginning on April 4, 2012 – six days before the complained-of arrests

---

[12] Similar to the District's blocking passage law, the regulation at issue in *White*, provided that, "[n]o person shall remain standing in a stationary position upon any sidewalk, boardwalk or other public thoroughfare so as to obstruct free pedestrian traffic thereon after being requested by a peace officer to move on." *White*, 679 F. Supp. 2d at 1148, n.2 (citing L.B.M.C. Sec. 10.10.060). Another similar regulation made it "unlawful for any person to so conduct his business or occupation, or use his property, or engage in any act or activity, if such conduct, use, act or activity obstructs, either partially or totally, free passage of other persons or vehicles along public sidewalks or roadways within the city limits. *Id.* (citing L.B.M.C. Sec. 10.10.070(a)).

took place. Am. Compl. ¶ 49. They further admit that some of their "participants slept on the sidewalk outside of Bank of America overnight and/or remained in sleeping bags during the day." *Id.* ¶ 54. Thus, they acknowledge that officers permitted them to engage in what amounted to a 24-hour vigil in front of the Bank of America. Moreover, by their own admissions, Plaintiffs were advised by the arresting officers that they could not block passage. They were not told that, however, they could not communicate their message in other ways, such as by marching, chanting, holding up signs, or engaging in other activity designed to communicate their message. *See, e.g., Occupy Minneapolis v. County of Hennepin*, 866 F. Supp. 2d 1062, 1070 (D. Minn. 2011) (finding that a prohibition on "chalking" was not unconstitutional as the plaintiffs had "ample alternative methods of communication available to them, including passing out flyers, carrying or wearing signs, and public speaking."). Also, at the time of Plaintiffs' arrest, Plaintiffs admit that the Occupy DC Movement enjoyed around-the-clock "occupation" of McPherson Square, which is across the street from the Bank of America branch that was the object of Plaintiffs' protest. *See* Am. Compl. ¶ 58; *see also Mitchell v. City of New Haven*, 854 F. Supp. 2d 238, 252-53 (D. Conn. 2012) (finding litigants involved in Occupy New Haven to have ample channels of communication available to them as they would be permitted to protest on the Green during certain hours, or in different parts of the city without similar restrictions); *Occupy Fresno v. County of Fresno*, 835 F. Supp. 2d 849, 863 (E.D. Cal. 2011) (determining that plaintiffs had ample alternative channels of communication available to conduct 24-hour vigils as they had available to them areas controlled by the City of Fresno, rather than the restricted areas controlled by the County, to communicate their message). Thus, it is without dispute that Plaintiffs had ample alternative channels of communication available to them on an around-the-clock basis across the street from the Bank of America.

The actions the Plaintiffs take issue with were simply reasonable time, place and manner restrictions that were narrowly tailored and served a substantial governmental interest. The amended complaint acknowledges that Plaintiffs had ample alternative channels of communication open to them. As such, the statute was constitutionally applied to Plaintiffs, and the as-applied challenge must fail.

### D. Plaintiffs Have Not Plead Facts to Demonstrate "Widespread Misapplication" of the Statute

Plaintiffs also claim that the even "[i]f the Blocking Passage law does not or its face or, as properly applied, violate the First and Fifth Amendments," the law is still unconstitutional because "the widespread misapplication of the statute is itself a violation of the First and Fifth Amendments." Am. Compl. ¶ 230. Plaintiffs have no standing to challenge the "widespread misapplication" of what they alternatively argue is a constitutional statute. A litigant may bring a First Amendment *facial* challenge to a statute to redress injuries other than his own. *See, e.g., Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 958 (1984) ("Facial challenges to overly broad statutes are allowed not primarily for the benefit of the litigant but for the benefit of society – to prevent the statute from chilling the First Amendment rights of other parties not before the court.") Here, however, Plaintiffs' "widespread misapplication" argument assumes the constitutionality of the statute at issue. Accordingly, Plaintiffs cannot seek to assert rights of other individuals or groups not currently before the Court.

Moreover, Plaintiffs have not set forth facts to support allegations of "widespread misapplication" of the statute. Rather, Plaintiffs rely solely on the alleged acknowledgement of an MPD official that the statute was purportedly misapplied to *one* musician on a Georgetown street corner. *See* Am. Compl. ¶¶ 192-196. Allegations of an isolated incident cannot support Plaintiffs' allegation here, even assuming Plaintiffs had standing to make it.

## II.     Plaintiffs' Constitutional Claims Must Be Dismissed

### A.  Plaintiffs Fail to State a Fifth Amendment Claim

Count V of Plaintiffs' amended complaint, which purports to allege a violation of the equal protection clause of the Fifth Amendment under a class-of-one theory, fails to state a claim for relief against both the District and the individual capacity defendants.   Generally, to succeed on an equal protection claim absent an allegation of membership in an "identified group," a plaintiff must demonstrate that "she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment."  *Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).   In *Engquist v. Oregon Department of Agriculture*, however, the Supreme Court confirmed that "discretionary decisionmaking based on a vast array of subjective, individualized assessments" is not subject to equal protection review.  553 U.S. 591 (U.S. 2008).  An equal protection challenge advanced under a class-of-one theory must therefore be dismissed if either (1) the state action about which the plaintiff complains is inherently "discretionary" under the meaning of *Engquist, supra*, or (2) the plaintiff fails to demonstrate either essential element of her class-of-one claim (i.e. differential treatment of similarly-situated parties or no rational basis).  Count V of the amended complaint is deficient in both respects.

### 1.  The Supreme Court's Decision in *Engquist* Bars Plaintiffs' Equal Protection Claim as a Matter of Law

Count V of the amended complaint must be dismissed because the actions about which Plaintiffs complain are not subject to scrutiny under the equal protection clause.  As noted above, in *Engquist*, the Supreme Court announced that the class-of-one theory of equal protection is a "poor fit" in contexts that involve discretionary state action:

> There are some forms of state action [ ], which by their nature
> involve discretionary decisionmaking based on a vast array of
> subjective, individualized assessments.  In such cases the rule that
> people should be "treated alike, under like circumstances and
> conditions" is not violated when one person is treated differently
> from others, because treating like individuals differently is an
> accepted consequence of the discretion granted.  In such situations,
> allowing a challenge based on the arbitrary singling out of a
> particular person would undermine the very discretion that such
> state officials are entrusted to exercise.

533 U.S. at 603.  After *Engquist*, a class-of-one equal protection claim purporting to challenge such "discretionary decisionmaking" is barred as a matter of law and must be dismissed accordingly.  *See Enquist, supra* (barring class-of-one claims in public employment context).

A police officer's decision to arrest an individual—the government conduct that forms the basis of Plaintiffs' equal protection claim—is a matter that requires an exercise of discretion based on a multiplicity of relevant variables.  *See Marcelle v. Brown County Corp.*, 680 F.3d 887, 898 (7th Cir. 2012) (Posner, J.) ("[p]olice exercise a good deal of discretion . . . . Many of their decisions are made in emotional settings, involving angry and frightened people, and after the fact it is easy to point to mistakes").  Indeed, the Court in *Engquist* specifically referred to law enforcement decisionmaking as illustrative of the type of state action that the class-of-one doctrine was not intended to reach:

> [A]n allegation that speeding tickets are given out on the basis of
> race or sex would state an equal protection claim, because such
> discriminatory classifications implicate basic equal protection
> concerns. But allowing an equal protection claim on the ground
> that a ticket was given to one person and not others, even if for no
> discernible or articulable reason, would be incompatible with the
> discretion inherent in the challenged action. It is no proper
> challenge to what in its nature is a subjective, individualized
> decision that it was subjective and individualized.

*Id.* at 604. *Engquist* thus makes clear that the "subjective, individualized decision[s]" to arrest Plaintiffs pursuant to D.C. Code § 22-1307, while subject to traditional class-based equal protection review, are not to be scrutinized under the class-of-one rubric. *Accord Marcelle*, 680 F.3d at 898 (based on *Engquist's* reasoning, "class-of-one suits should not be permitted against police officers or police departments . . . unless the police, acting from personal motives, with no justification based on their public duties, intend to disfavor the plaintiff"); *Flowers v. City of Minneapolis*, 558 F.3d 794, 799 (8th Cir. 2009) (holding that "[a] police officer's decisions regarding whom to investigate and how to investigate are matters" that "may not be attacked in a class-of-one equal protection claim" after *Engquist*). As such, Plaintiffs' class-of-one equal protection claim is barred as a matter of law, and Count V of the amended complaint must be dismissed as to all District defendants.

2. **Even if Plaintiffs' Equal Protection Claim Is Not Barred As a Matter of Law, Plaintiffs Have Failed to State a Claim for Relief Under a "Class-of-One" Theory**

*Engquist* notwithstanding, in order to state a viable class-of-one equal protection claim, Plaintiffs must demonstrate that "[they have] been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Olech*, 528 U.S. at 564. Both elements—intentional differential treatment of similarly-situated parties and no rational basis—are "essential." *3883 Conn. LLC v. District of Columbia*, 336 F.3d 1068, 1075 (D.C. Cir. 2003). For the reasons set forth below, Plaintiffs' amended complaint does not plausibly demonstrate either element, and Count V must be dismissed accordingly.

1. **Plaintiffs have not Alleged Sufficient Similarity between Themselves and the "Innumerable Individuals" Referenced in Their Amended Complaint**

The requirement that a class-of-one plaintiff plead the existence of a similarly-situated comparator "is not a mere formality." *See Quezada v. Marshall*, 2013 U.S. Dist. LEXIS 5803 at *16 (D.D.C. Jan. 15, 2013). Indeed, the requirement "serves to distinguish claims to the treatment that was afforded others, which can be cognizable under principles of equal protection, from bare complaints of governmental unfairness, which cannot." *See id.* (citations omitted). For that reason, to survive a motion to dismiss, a class-of-one plaintiff must plead facts demonstrating a "high degree of similarity" between themselves and their alleged comparators. *See Ruston v. Town Bd. of Skaneateles*, 610 F.3d 55, 59 (2d Cir. 2010); *accord Tate v. District of Columbia*, 627 F.3d 904, 910 (D.C. Cir. 2010) (affirming dismissal of plaintiff's class-of-one claim any similarly situated person [with comparable relevant circumstances] who was treated differently").[13] Plaintiffs fail to satisfy this requirement.

Count V of the amended complaint identifies as Plaintiffs' alleged comparator the "innumerable individuals [who] sit on sidewalks every day in the District, such as individuals camping outside a store for a Black Friday sale or sitting in line overnight to get tickets to a blockbuster movie." Am. Compl. ¶¶ 325, 327. This broad reference to an indeterminate number of *hypothetical* pedestrian-groups clearly lacks the key factual details required for the Court to make a *prima facie* determination as to whether the Plaintiffs and the "innumerable individuals" to whom they refer are similarly situated in relevant respects. *See Griffin Indus.v. Irvin*, 494 F.3d 1189, 1205 (11th Cir. 2007) ("[a] class of one plaintiff might fail to state a claim by

---

[13] Other federal circuits have gone so far as to require that similarly-situated comparators "be prima facie identical in all relevant respects," where, as here, the state action at issue "was undeniably multi-dimensional." *See Grider v. City of Auburn*, 618 F.3d 1265 (11th Cir. 2010); *Cf. Umani v. Mich. Dep't of Corr.*, 432 Fed. Appx. 453, 461 (6th Cir. 2011) (class-of-one plaintiff "must show that he was similarly situated in all relevant respects").

omitting key factual details in alleging that it is similarly situated to another").  Indeed, as alleged in the amended complaint, the sole similarity between Plaintiffs and their purported comparator-groups is physical presence on District sidewalks.  Especially given the complex decisionmaking process inherent in law enforcement, such a generalized accusation of similarity is insufficient to infer that Plaintiffs were singled out vis-à-vis any similarly-situated person or persons.  *See Hawkins v. Eslinger*, 2008 U.S. Dist. LEXIS 39492 at *9-14 (M.D. Fla. May 15, 2008) (dismissing class-of-one equal protection claim because general allegation that "similarly situated complainants and victims of domestic violence exist" lacked "key factual details" necessary to establish a similarly situated comparator).  In fact, when distilled to its essence, Plaintiffs' equal protection challenge makes no charge of *discriminatory* treatment at all, but rather, a generalized complaint of unfair process.  Because the latter is not actionable under a class-of-one theory of equal protection, *see Quezada, supra*, Count V of Plaintiffs' amended complaint fails to state a viable claim for relief and must be dismissed as to all District defendants. [14]

### 2.  Plaintiffs' Amended Complaint Fails to Demonstrate that Defendants had No Rational Basis for the Challenged Conduct

Even if Plaintiffs had sufficiently alleged the existence of a similarly-situated comparator, their class-of-one equal protection claim must fail because the amended complaint does not demonstrate that there was no rational basis for the purported differential treatment.  The rationality of government action "is accorded a strong presumption of validity, and the burden is

---

[14] Even assuming Plaintiffs had pleaded facts to demonstrate sufficient similarity between themselves and their purported comparators, the amended complaint simply does not give rise to a plausible inference that any alleged differential treatment was intentional.  *See Olech*, 528 U.S. at 564 (differential treatment accorded class-of-one plaintiff must be done "intentionally").  Notably, Plaintiffs have not alleged that any individually named defendant was aware of any similarly situated group of individuals sitting on a sidewalk within the District at the time of Plaintiffs' arrests or that Plaintiffs brought any such observation to anyone's attention.  *See Scocca v. Smith*, 2012 U.S. Dist. LEXIS 178324 at *26-31 (identifying lack of knowledge of alleged disparate treatment as grounds for dismissing plaintiff's class-of-one equal protection claim).

on the one attacking the [action] to negative every conceivable basis which might support it, whether or not the basis has a foundation in the record." *Tate*, 627 F.3d at 910 (internal quotations and citations omitted). Plaintiffs' amended complaint is flush with facts providing a rational basis for the government conduct underlying Plaintiffs' equal protection claim, which the Court cannot ignore in favor of conclusory allegations that Plaintiffs' arrests were "irrational and arbitrary." Am. Compl. ¶ 328. For example, relying solely upon Plaintiffs' characterization of the relevant events, the information available to the individual officers included: (1) D.C. Code § 22-1307, by its terms, permits the arrest of a person "crowding, obstructing, or incommoding after [the person is] instructed by a law enforcement officer to cease" the proscribed activity; (2) based on information supplied by the Office of the Attorney General, partial "crowding, obstructing, or incommoding" of a public way falls within the conduct that the statute was intended to reach, *see* Am. Compl. ¶ 83; (3) Plaintiffs were (at least) partially "crowding, obstructing, or incommoding" the sidewalk in front of Bank of America, *see e.g.*, *id.* at ¶ 160 (Plaintiffs "were sitting in a row parallel and immediately next to the outer wall of the building . . . taking up approximately 2.5' . . . of the sidewalk"); and (4) Plaintiffs continued to "crowd, obstruct, or incommode . . . after being instructed by [the officers] to cease" and disperse, *see e.g.*, *id.* at ¶ 166 ("one MPD officer told the group that if they did not move they would be arrested for blocking passage"). Based on those facts alone, the individual officers reasonably believed that Plaintiffs' conduct violated D.C. Code § 22-1307 and that their arrests for violating the statute were likewise based on probable cause. In other words, there was a wholly rational basis for Plaintiffs' arrests, and Count V of the amended complaint thus fails to state a claim for relief.

**B. Plaintiffs Have Failed to State a Claim for Municipal Liability Under *Monell***

It is beyond well-settled that a municipality can only be liable under Section 1983 if "the governmental body itself 'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation." *Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011). The District, therefore, cannot be vicariously liable for the unconstitutional acts of its employees; rather, a municipality will be liable only for its "*own* illegal acts." *Id.* (emphasis in original); *see also Monell v. Department of Soc. Servs.*, 436 U.S. 658, 691 (1978) ("a municipality cannot be held liable under § 1983 on a respondeat superior theory"). Thus, to survive a motion to dismiss, a plaintiff must first "state[] a claim for a predicate constitutional violation." *Baker v. District of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003) (citing *Collins v. City of Harker Heights*, 503 U.S. 115, 124 (1992)). Once the plaintiff has established a constitutional violation, the Court must then determine whether the plaintiff has pled sufficiently plausible facts to show that a custom or policy of the municipality actually caused the alleged violation. *Warren v. District of Columbia*, 353 F.3d 36, 38 (D.C. Cir. 2004).

There are several ways that a constitutional violation may be shown to have been caused by a municipality's custom or policy. First, a plaintiff can demonstrate that "the municipality or one of its policymakers explicitly adopted the policy that was the moving force of the constitutional violation." *Id.* at 39 (internal quotation marks omitted). Second, a plaintiff can prove a violation by showing "the action of a policy maker with the government." *Baker*, 326 F.3d at 1306 (citing *City of St. Louis v. Prapotnik*, 485 U.S. 112, 123-30 (1988)). Third, a plaintiff can show "the adoption through a knowing failure to act by a policy maker of actions by his subordinates that are so consistent that they have become 'custom.'" *Id.* (quoting *Prapotnik*, 485 U.S. at 130). Finally, "the failure of the government to respond to a need (for example,

training of employees) in such a manner as to show 'deliberate indifference' to the risk that not addressing the need will result in constitutional violations" can amount to an unconstitutional policy." *Id.* Plaintiffs have failed to plead facts that would support any one of these methods of establishing a constitutional violation by the District.

### 1. Plaintiffs Have Not Pled Facts to Support a Finding of an Unconstitutional Policy

Here, Plaintiffs have attempted to prove their *Monell* claim by asserting that the District's blocking passage law "is an unconstitutional policy which violates Plaintiffs' First Amendment rights to freedom of speech and assembly." Am. Compl. ¶ 296; *see also id.* ¶ 333 (the District "is liable to all of the plaintiffs because the Blocking Passage law, as written and as applied to Plaintiffs' conduct, is an unconstitutional policy which was the moving force behind the violation of Plaintiffs' First and Fourth Amendment rights."). As demonstrated *supra*, however, D.C. Code § 22-1307 is constitutional – both on its face and as applied to Plaintiffs. Thus, Plaintiffs may not rest their *Monell* claim for violation of their First Amendment rights on the assertion that the Blocking Passage law is an unconstitutional policy. *Monell*, 436 U.S. at 694-95.

### 2. Plaintiffs Have Not Pled Facts to Support a Finding of Deliberate Indifference to an Obvious Need to Train

Plaintiffs also seek to hold the District liable via the training component of the *Monell* analysis, asserting that the District "maintain[ed] an unconstitutional policy, custom or practice of failing to adequately train and supervise MPD employees regarding the proper application of the Blocking Passage law." Am. Compl. ¶ 317. In this regard, Plaintiffs face a difficult challenge: "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick*, 131 S. Ct. at 1359 (citing *Oklahoma City v. Tuttle*,

471 U.S. 808, 822-23 (1985)).  The District can be held liable if a constitutional policy is unconstitutionally applied by employees where the District did not adequately train the employees and "the constitutional wrong has been caused by that failure to train," *City of Canton v. Harris*, 489 U.S. 378, 387 (1989), but the alleged failure to train "must amount to "deliberate indifference to the rights of persons with whom the untrained employees came into contact." *Connick*, 131 S. Ct. at 1359 (internal quotations and brackets omitted).  "Only then 'can such a shortcoming be properly thought of as a city "policy or custom" that is actionable under § 1983.'"  *Id.* at 1359-60 (quoting *City of Canton*, 489 U.S. 389).  Indeed, "'deliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action."  *Board of Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 410 (1997).

Plaintiffs' contentions do not meet this stringent standard in several aspects.  First, they fail to make any allegations (let alone plausible allegations) that the District did not conduct training on any specific issue, or that the any alleged failure to train was the moving force behind any alleged deprivation.  While they take issue with the training that the District did conduct, they do not contend or offer any facts to plausibly support an inference that the complained-of training was the *only* training.  Second, Plaintiffs rely on reports, statements, and anecdotes that they claim put the District on notice of a need to train, but do not plead any facts that would demonstrate that the need to train was "obvious" or that the District considered the issue and consciously disregarded the need to train.[15]  As demonstrated below, none of Plaintiffs' allegations satisfy the requisite pleading standard.

---

[15] Rather than plead facts to demonstrate that any action of the District was the moving force behind any of the alleged deprivations, Plaintiffs inappropriately bootstrap their failure-to-train argument to their vagueness claim: "[a]s a result of the vagueness of D.C. Code § 22-1307, *alone or in combination with* the lack of MPD training and supervision and the failure of the Council to clarify the law, this provision has come to be used as an

### a. The 2003 Office of Police Complaints Report

Plaintiffs cite a 2003 report issued by the Office of Police Complaints ("OPC") entitled "Disorderly Conduct Arrests Made by Metropolitan Police Department Officers." Am. Compl. ¶ 184. Plaintiffs contend that this report described an "extensive study of disorderly conduct arrests in the District and made policy recommendations that went to the Mayor and City Council." *Id.* Plaintiffs claim that the "report provided the District with constructive notice of widespread constitutional violations." *Id.* However, Plaintiffs fail to acknowledge that the District's disorderly conduct laws are comprised of many different types of offenses. In that regard, they fail to plead that the alleged constitutional violations identified by OPC in 2003, were the same or even similar to the alleged deprivations that took place in 2012 that are the subject of this lawsuit. Without any facts to support the propositions that the "policy recommendations" made in the 2003 OPC report were related to the issues in this lawsuit, were considered by the District and disregarded, and, of course, that those actions were the moving force behind the specific constitutional violations alleged here, the 2003 OPC report issued nine years before Plaintiffs' arrests cannot support Plaintiffs' alleged failure to train claim. *See Pembaur v. Cincinnati*, 475 U.S. 469, 483 (1986) (holding that "municipal liability under § 1983 attaches where – and only where – a deliberate choice to follow a course of action is made among various alternative by [the relevant] officials…"); *see also Tuttle*, 471 U.S. at 823.[16]

---

unconstitutional anti-loitering statute." *Id.* ¶ 192 (emphasis added). Such an assertion does not satisfy *Monell's* rigorous standards.

[16] This is particularly true here where the District amended the blocking passage law on May 26, 2011 – approximately eight years after the OPC report. *See* D.C. Code § 22-1307.

### b. Council for Court Excellence Report/Washington Legal Clinic for the Homeless Testimony

Plaintiffs also cite a 2010 Council for Court Excellence (CCE) report entitled, "Revising the District of Columbia Disorderly Conduct Statutes: A Report and Proposed Legislation." *Id.* ¶ 186. Plaintiffs contend that the CCE report, which suggested that the revised Blocking Passage law should not prohibit "incommoding," "obstructing," or "crowding," as well as Council testimony from the Washington Legal Clinic for the Homeless stating that officers "told 'many' individuals to move along in situations which could not possibly be interpreted as incommoding," placed the District on notice "that the statute had the potential to be abused, and that its administration should be carefully monitored." *Id.* ¶¶ 187, 189, 191. But, while Plaintiffs allege that the District was on notice that the statute allegedly had the potential to be abused, they plead no facts to demonstrate that the District actually either did not provide training on the statute, or made a conscious choice to not train. Rather, they simply allege that the District had notice. These allegations also do not satisfy the requisite pleading standard as they cannot support that any failure to train rose to the level of a policy or custom of the District. *See Connick*, 131 S. Ct. at 1359-60.

### c. The Musician in Georgetown

Likewise, Plaintiffs' reference to one street musician threatened with arrest cannot support their failure to train argument. Am. Compl. ¶ 193. Plaintiffs claim that when the ACLU brought the incident to the attention of high-ranking officials of MPD, they allegedly acknowledged that the officer had misinterpreted the law. *Id.* ¶¶ 194; 196. Plaintiffs never allege, however, that the District declined to train its officers in conscious disregarded of an alleged obvious need to train.

Generally, "[a] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Connick*, 131 S. Ct. at 1360 (citing *Bryan Cty*, 520 U.S. at 409). While *City of Canton* "did not foreclose the possibility that evidence of a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation, could trigger municipal liability," *Bryan Cty*, 520 U.S. at 409 (citing *City of Canton*, 489 U.S. at 390 & n.10), here Plaintiffs have not alleged facts to demonstrate that the city failed to train and that the single incident involving a single MPD officer they cite creates an obvious potential for recurring violations. Rather, they allege only that MPD's Director of the Office of Strategic Change testified at a February 1, 2012 Council hearing that an online training program was established, and that the program does not address the issue of partial blocking of the sidewalk. Am. Compl. ¶¶ 200-201. They do not, however, allege that this was the only training conducted.

Likewise the facts relating to the single incident in Georgetown do not rise to *City of Canton's* level of obviousness. There, the Court hypothesized that in a situation where a municipality provides its police officers with firearms and entrusts them to apprehend fleeing felons, the need to train the officers on the constitutional limitations on the use of deadly force would be so obvious that the failure to do so could be construed as deliberate indifference. *City of Canton*, 489 U.S. at 390 n.10. Here, however, Plaintiffs seem to assert that the mere fact that the city issues a law that can be misinterpreted, and because it was allegedly misinterpreted in one particular incident, the District must have been deliberately indifferent. This is inconsistent with holdings of the Supreme Court which expressly recognize that the "deliberate indifference" standard necessarily is stringent, as a city's inaction despite prior notice "is the functional

equivalent of a decision by the city itself to violate the Constitution." *Id.* at 395 (O'Connor, J.,

concurring in part and dissenting in part). "A less stringent standard of fault for a failure-to-train

claim 'would result in *de facto respondeat superior* liability on municipalities ....'" *Connick*, 131

S. Ct. at 1360 (quoting *City of Canton*, 489 U.S. at 392). "Neither occasional negligent

administration nor actions of individual officers…can be attributed to the District." *Matthews v.*

*District of Columbia*, 2013 WL 602422, *7 (D.D.C. Feb. 19, 2013) (citing *Canton*, 489 U.S. at

391; *Bryan Cty*, 520 U.S. at 408). Thus, Plaintiffs anecdotal examples in their First Amended

Complaint cannot support their *Monell* claim.

### d. Comments and Testimony at a February 1, 2012 Council Hearing

Finally, Plaintiffs allege that during the February 1, 2012 hearing:

> Councilmember Mendelson explained that disorderly conduct offenses can be
> easily misunderstood and suggested that training may be as important, or more
> important, than the clarity that the Council thought it brought to the law. He
> pointed out that an intensive refresher training may be needed, not doing it once.
> Councilmember Mendelson asked Ms. O'Meara to get back to him on what MPD
> will do on intensive refresher training and how often.

Am. Compl. ¶ 204. While Plaintiffs arguably allege facts that could support an inference that the

District was on notice of a need to train, Plaintiffs do not allege facts that could plausibly

demonstrate that the District (1) considered the councilmember's remarks; (2) acknowledged an

obvious need to train; or (3) chose to disregard the suggestions all before the Plaintiffs' arrests

two and one-half months later. Rather, Plaintiffs contend that Councilmember Mendelson asked

the MPD representative "whether it was worth conducting the training again" in 2012, and that

the representative responded that "MPD needed to review, based on the feedback they were

getting from the ACLU and the Office of Police Complaints, what information needed to be

updated and changed." *Id.* ¶ 202. If anything, this demonstrates that the District was *not*

deliberately indifferent, but rather, was affirmatively working with civil liberties groups in an effort to modify training as necessary.

Likewise, while Plaintiffs contend that MPD did not update its disorderly conduct circular, and instead allowed it to expire less than 3 months before Plaintiffs' arrest, *see* Am. Compl. ¶ 206, they also claim that the circular did not adequately address the issue of partial blocking. The fact that one circular that allegedly did not address the particular constitutional violation expired cannot be the moving force behind Plaintiffs' constitutional deprivation. Moreover, the fact that the circular was not updated or revised after the colloquy at the Council on February 1st and before the Plaintiffs' arrests began on April 10th cannot be plausibly deemed to rise to the level of deliberate indifference.[17] That these factual allegations do not rise to deliberate indifference is particularly true where Plaintiffs have not (and cannot) allege that MPD affirmatively decided it would take no action on training; instead, Plaintiffs have specifically pled that MPD was considering the need for more training based on feedback it received from ACLU and OPC. Am. Compl. ¶ 202.

Accordingly, Plaintiffs have set forth no facts to support their claim that the District was deliberately indifferent to an obvious need to train, and that the District's failure to so train was the moving force behind their alleged constitutional deprivations. As such, Plaintiffs' *Monell* claims must be dismissed.

---

[17] Additionally, the fact that a representative of the ACLU had testified at the February 1 hearing that advocates of the homeless had reported that the law had allegedly been misapplied to others in Georgetown, *see* Am. Compl. ¶ 197, cannot establish that the District disregarded any need for training, even assuming that such a need was obvious, and that this (never established) disregard then resulted in alleged constitutional deprivations ten weeks later.

### 3. Plaintiffs Have Not Sufficiently Alleged a Basis for Municipal Liability as to Their Equal Protection Claim

As addressed *supra* in Section II.A, Plaintiffs have failed to state a claim for violation of their equal protection rights. Even assuming *arguendo* that Plaintiffs have, they have not plead facts supporting an inference that a District custom or policy was responsible.

To be sure, the amended complaint seeks to attach liability to the District for the alleged violation of Plaintiffs' equal protection rights in two (arguably three) distinct ways, all of which are woefully inadequate to satisfy the pleading standard of Rule 8(a). First, according to Plaintiffs, the District "is liable [in a class-of-one claim] without the need to meet the traditional standards for municipal liability." Am. Compl. ¶ 329. This assertion is flatly incorrect since, as noted above, the District is "not vicariously liable under § 1983 for [its] employees' actions." *Monell*, 436 U.S. at 691.

Plaintiffs next invite the Court to "*infer*[ ] from the wide scope of the [alleged] conspiracy and the number of different . . . employees involved" as well as "the repeated arrests over four days" that the alleged equal protection violation was either authorized by "someone with final policymaking authority" or otherwise committed pursuant to a District "policy, custom, or practice." *See* Am. Compl. ¶ 330-31. But under *Iqbal, supra,* such bald allegations are insufficient to establish municipal liability, even taking as true the facts on which they rests. *See Hernandez v. District of Columbia*, 845 F. Supp. 2d 112, 117 (D.D.C. 2012) (citing *Smith v. District of Columbia*, 674 F. Supp. 2d 209, 214 n.2 (D.D.C. 2009) for the proposition that "courts in this district have concluded [that] the fact that the case arises under section 1983 does not relieve a plaintiff of his obligation to satisfy the criteria established in *Iqbal* and *Twombly*"). [18] Indeed, assuming Plaintiffs' allegations as true, there is still no indication whatsoever (beyond

---

[18] As noted elsewhere in this brief as well as the dispositive motions filed by the non-District defendants, the allegations of the amended complaint are woefully insufficient to state a plausible conspiracy claim.

Plaintiffs' own speculation) that the District or any employee with sufficient policymaking authority was even aware of Plaintiffs' arrests, let alone that the District impliedly or tacitly approved, authorized or encouraged its first-line law enforcement personnel to, as Plaintiffs maintain, single them out for differential treatment. In short, Plaintiffs have failed to plausibly tie their class-of-one equal protection claim "either to an official District policy, to an unofficial governmental 'custom', or to any official with policy-making authority," *Hobson v. Wilson*, 737 F.2d 1, 55 (D.C. Cir. 1984) (citation omitted), and *Iqbal* requires that the Court refuse Plaintiffs' invitation to gloss over such key factual omissions, *see Hernandez, supra.* Plaintiffs have thus failed to allege any viable basis for municipal liability with respect to their equal protection challenge, and Count V must therefore be dismissed as to the District.

### C. Plaintiffs Have Failed to State Constitutional and Conspiracy Claims Against the Individual MPD Defendants

#### 1. Plaintiffs Have Failed to State a Claim for First Amendment Retaliation (Count IV)

Plaintiffs assert that each individual MPD officer either arrested or caused to arrest the Plaintiffs in retaliation for exercising their First Amendment rights, or conspired to arrest or cause to arrest Plaintiffs in violation of their First Amendment rights. *See* Am. Compl. ¶¶ 270-87; 294. Plaintiffs have not pled facts to support a plausible claim under either theory.

In *Hatfill v. Ashcroft*, the court held that to prevail on a First Amendment retaliation claim, a litigant must show "that '(1) he has an interest protected by the First Amendment; (2) defendants' actions were motivated or substantially caused by his exercise of that right; and (3) defendants' actions effectively chilled the exercise of his First Amendment right.'" *Hatfill v. Ashcroft*, 404 F. Supp. 2d 104, 117-18 (D.D.C. 2005) (quoting *Curley v. Village of Suffern*, 268

F.3d 65, 73 (2d Cir. 2001) (citation omitted).[19]  Plaintiffs here have not pled facts to plausibly demonstrate that the actions of the individual District Defendants were motivated or substantially caused by Plaintiffs' exercise of their First Amendment rights, or that the actions effectively chilled the exercise of their rights.

First, with respect to the arresting officers, Plaintiffs have not pled any facts to support the proposition that the actions of the officers in arresting Plaintiffs were motivated or substantially caused by Plaintiffs' exercise of their rights.  To the contrary, Plaintiffs allege that the actions of the arresting officers were the direct result of order of their supervisors.  *See* Am. Compl. ¶¶ 103, 114-15; 117; 125-28.  Because Plaintiffs claim that the arresting officers and mid-level officials were merely following the orders of their commanding officials, Plaintiffs have not pled facts to support an essential element of their claim against the arresting officers, and thus Plaintiffs' claims of First Amendment retaliation against the arresting officers must be dismissed.[20]

Second, with respect to the commanding officials, the facts Plaintiffs set forth do not support an inference that their actions were motivated by Plaintiffs' activities.  Rather, the facts pled demonstrate that the officials ordered the Plaintiffs to be arrested because they were in violation of a statute that prohibited any blocking of the sidewalk, and not because of any particular message Plaintiffs sought to convey, or the fact that they were conveying a message while engaging in partial blocking of the sidewalk.  The fact that Plaintiffs were engaging in expressive conduct cannot, in and of itself, lead to a conclusion that the arrest was motivated by

---

[19] *Cf. Worrell v. Henry*, 219 F.3d 1197, 1212 (10th Cir. 2000) (to establish a *prima facie* retaliation claim, a plaintiff must show (1) she was "engaged in constitutionally protected activity;" (2) defendant's actions caused plaintiff "to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity;" and (3) "defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct.").

[20] These individuals are Sergeants Urps and Schaeffer and Officers Wells, Evans-Freeman, Mentzer, Garibay, Franchak, Silva, Ai, and LaGon.

that expression. Because Plaintiffs were engaged in conduct that could be regulated by the government as demonstrated above, and Plaintiffs were advised that they would be arrested if they did not cease blocking the sidewalk (even if their blocking was only partial blocking), the facts pled demonstrate that the actions of the officers were motivated or substantially caused by Plaintiffs' presence on the sidewalk. Plaintiffs' allegations that the actions were motivated by expressive activity are pure speculation and not grounded in any fact.

Plaintiffs' retaliation claim also fails as it is abundantly clear from the amended complaint that Plaintiffs' speech was not chilled by the actions of any of the officers. Plaintiffs contend that the sleepful protests in front of the Bank of America began on or about April 4, 2012, continued daily, and even involved some protestors sleeping in front of the bank at night. Am. Compl. 49, 54, 57. Although the arrests began on April 10, 2012, some of the Plaintiffs and others continued their sleepful protests in front of the Bank of America after that date. Likewise, when more protestors were arrested on April 11 and 12, 2012, some of the Plaintiffs and others continued their sleepful protests in front of the Bank of America.[21] Thus, Plaintiffs facts do not demonstrate that Plaintiffs were chilled by the arrests; if anything, the facts show that Plaintiffs were even more motivated to continue to exercise any First Amendment rights they claimed to have, notwithstanding any alleged retaliation. The fact that Plaintiffs were not "actually chilled" by any individual MPD officer is fatal to Plaintiffs' First Amendment retaliation claim. "'[W]here a party can show no change in his behavior, he has quite plainly shown no chilling of his First Amendment right to free speech.'" *Hatfill*, 404 F. Supp. 2d at 117 (quoting *Curley*, 268 F.3d at 73); *see also Krieger v. United States Dept. of Justice*, 529 F. Supp. 2d 29, 57-58 (D.D.C. 2008) (finding no First Amendment violation where plaintiff could not demonstrate that his

---

[21] More protestors were arrested on April 13, 2012; it is unclear from the amended complaint whether Plaintiffs and others continued their sleepful protests in front of Bank of America following the April 13 arrests.

speech was chilled by the actions of the defendant); *Dodge v. Trustees of the Nat'l Gallery of Art*, 326 F. Supp. 2d 1, 16 (D.D.C. 2004) (finding no First Amendment violation where there was no evidence that defendant's alleged retaliation actually interfered with plaintiff's right to petition the government).

### 2. Plaintiffs Have Failed to State Any Conspiracy Claim Against the Individual Defendants

Plaintiffs set forth three types of conspiracy claims against the individual Defendants: (1) conspiracy to arrest Plaintiffs in violation of their First Amendment rights; (2) conspiracy to arrest Plaintiffs in violation of their Fourth Amendment rights; and (3) conspiracy to falsely arrest/imprison Plaintiffs in violation of common law. As shown herein, because Plaintiffs have not set forth facts that would demonstrate that the officers had sufficient knowledge of any alleged goal of any alleged conspiracy, none of these claims can survive. "A claim of civil conspiracy is established by proof of (1) an agreement between two or more persons; (2) to participate in an unlawful or tortuous act; and (3) an injury caused by an unlawful or tortuous overt act performed by one of the parties; (4) which was done pursuant to and in furtherance of the common scheme." *Ungar v. Islamic Republic of Iran*, 211 F. Supp. 2d 91, 100 (D.D.C. 2002) (citing *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983). While proof of a civil conspiracy "does not require proof of 'knowing and substantial assistance' to any particular act….conspiracy does require proof of a 'common and unlawful plan whose goals are known to all members,' even if all parties are not privy to each individual act taken in furtherance of the common objective." *Id.* (quoting *Hobson v. Wilson*, 737 F.2d 1, 55 (D.C. Cir. 1984) (overruled in part on other grounds *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163 (1993))).

Here, Plaintiffs allege – only on "information and belief" – that Lt. Scott and Defendant Massey "discussed plans to have the protestors illegally arrested," because – again on information and belief – "the sidewalk demonstration was embarrassing to" Bank of America. Am. Compl. ¶¶ 77; 80.[22]  Plaintiffs also allege, again on information and belief, that Lt. Scott spoke in furtherance of the conspiracy to Cmdr. Sund and Capt. Shelton "about potential plans to have the protestors arrested." *Id.* ¶ 82.

Regarding all other individual MPD Defendants (*i.e.* those other than Lt. Scott, Cmdr. Sund, and Capt. Shelton) Plaintiffs do not allege any facts to support that they had any knowledge at all of the purported plan, or shared in any way in the alleged plan, or even knew of the goals of the plan.  Rather, Plaintiffs only allege that these other officers and officials were instructed to arrest the Plaintiffs, or ordered to designate other officers to arrest Plaintiffs, without any knowledge of a common goal or plan, any indication of a desire to further any alleged plan, or any desire to save the Bank of America from "embarrassment."  With respect to Cmdr. Sund and Capt. Shelton, Plaintiffs assert only that Lt. Scott "spoke to his superiors about potential plans to have the protestors arrested." Am. Compl. ¶¶ 82; 83.  There is no indication that Cmdr. Sund or Capt. Shelton were aware of any common scheme or plan to save the Bank of America from embarrassment, or that they instructed others to make arrests for the purposes of

---

[22] The Federal Rules of Civil Procedure permit a party to plead an allegation or denial upon "information and belief," provided of course that the allegations satisfy the general pleading requirements as interpreted by the Supreme Court.  *See Kowal v. MCI Communications Corp.*, 16 F.3d 1271, 1279 n. 3 (D.C. Cir. 1994) (observing that "standards for pleadings on information and belief must be construed consistent with the purposes of [pleading rules], which attempts in part to prevent the filing of a complaint as a pretext for the discovery of unknown wrongs").  In light of the plausibility standard developed in *Iqbal* and *Twombly*, salient facts plead on "information and belief" will be insufficient to support a claim for relief unless: (1) the facts are peculiarly within the possession and control of the defendant; and (2) the belief is based on factual information that makes the inference of culpability plausible.  *Evangelou v. District of Columbia*, 2012 U.S. Dist. LEXIS 158322 at *24 (D.D.C. Nov. 5, 2012) (citing *Arista Records LLC v. Doe*, 604 F.3d 110, 120 (2d Cir. N.Y. 2010)).  According to this standard, the plethora of allegations by Plaintiffs that are made "on information and belief," are wholly insufficient to sustain their claims.

furthering this alleged common plan or scheme.[23]  The same analysis applies to Plaintiffs' claims that the arresting officers and officials are liable to Plaintiffs as co-conspirators to arrest Plaintiffs in violation of their Fourth Amendment rights (Am. Compl. ¶ 315 (Count V)), and the common law (Am. Compl. ¶¶ 251 (Count I)).

Finally, with respect to Lt. Scott, the facts that Plaintiffs plead simply cannot support a plausible scheme or plan.  Plaintiffs claim that Defendant Massey, a former MPD employee, was employed by Bank of America as a security executive, and that (on information and belief) Defendant Massey spoke to Lt. Scott, his former colleague, about the protestors in front of the Bank of America branch.  Am. Compl. ¶¶ 72-76.  From these allegations, Plaintiffs then engage in pure speculation that this conversation must have led to a conspiracy to arrest the protestors because they were embarrassing Bank of America.  This is not plausible for many reasons: Plaintiffs have pled no facts upon which to infer (1) that protestors in front of the bank (as opposed to the around-the-clock "occupation" taking place across the street) were an embarrassment to the Bank or Akridge; (2) that Lt. Scott had any interest in protecting the Bank of America or Akridge from embarrassment; or (3) that Lt. Scott had any motive to do so. Rather, Plaintiffs engage in pure fantasy, and offer no actual facts to support their "information and belief" that the District Defendants (and particularly, the rank-and file police officers at MPD) shared some desire that compelled them to take illegal action to protect a multi-national corporation from embarrassment.  Absent factual allegations that meet the plausibility standard set forth in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), Plaintiffs' allegations do not rise above the speculative level; thus, their claims of conspiracy to violate constitutional rights or to

---

[23] There are absolutely no facts to indicate that Eric Waldt, a civilian employee responsible for training at the Metropolitan Police Academy, or Commander of the Second District Michael Reese had any knowledge of or participation in any common plan, or that they acted to further any purported goal of an unlawful scheme.  Thus, all conspiracy claims against Mr. Waldt and Commander Reese should be dismissed.  *See* Am. Compl. ¶¶ 251, 294, 315.

retaliate against Plaintiffs for exercising their First Amendment rights, as set forth in Count IV, as well as their claims of conspiracy to arrest Plaintiffs in violation of their constitutional and common law rights (Counts I and V), of the amended complaint must be dismissed.[24]

### 3. Plaintiffs Have Failed to State a Constitutional Failure-to-Train Claim Against Michael Reese, Steve Sund, or Eric Waldt

Plaintiffs contend that Mr. Waldt, Commander Reese and Commander Sund are liable for constitutional violations for their deliberate indifference to a need to train. *See* Am. Compl. ¶¶ 289-93, 318-22. "As the D.C. Circuit has emphasized, 'the overwhelming majority of courts faced with claims of supervisory liability ... have determined that where responsibility is predicated on inattentiveness rather than affirmative misconduct, the plaintiff must establish a high degree of fault in order to implicate the supervisor in the constitutional infractions of his subordinates.'" *Robinson v. District of Columbia*, 403 F. Supp. 2d 39, 50 (D.D.C. 2005) (quoting *Haynesworth v. Miller*, 820 F.2d 1245, 1261 (D.C. Cir. 1987)). And, as this Court has observed, the Plaintiffs bear a significant burden in demonstrating supervisor liability under Section 1983 for alleged failure to train or supervise. The plaintiff "must show that the official was responsible for supervising the wrongdoer; that a duty to instruct the subordinate to prevent unconstitutional harm arose from the surrounding circumstances; and that, as a result of the official's failure to instruct, the plaintiff was harmed." *Hardy v. District of Columbia*, 601 F. Supp. 2d 182, 190-91 (D.D.C. 2009) (citations, internal quotations, and alterations omitted). Additionally, this Court noted that "because deliberate indifference requires the official to have

---

[24] In the event that the Court finds that the no non-District Defendants have engaged in conspiratorial conduct, then Plaintiffs' attempt to plead a civil conspiracy (under 42 U.S.C. § 1983 or otherwise) must be barred by the intracorporate conspiracy doctrine. The intracorporate conspiracy doctrine provides that there can be no conspiracy if the alleged conspiratorial conduct is "essentially a single act by a single corporation acting exclusively through its own [employees]." *Rawlings v. District of Columbia*, 820 F. Supp. 2d 92, 103 (D.D.C. 2011) (quoting *Hermann v. Moore*, 576 F.2d 453, 459 (2d Cir. 1978)). In light of the foregoing, the individual District Defendants, who, at all times, were acting "under color of District law….within the scope of [their] employment," *see* Am. Compl. ¶¶ 15-33, comprise a single entity that is incapable of conspiring with itself."

subjective knowledge of the substantial risk of harm, the D.C. Circuit has held that supervisory liability cannot be applied absent any allegation that the supervisors in question had actual or constructive knowledge of past transgressions or that the supervisors were responsible for or aware of clearly deficient training." *Id.* at 191 (citations and internal quotations omitted). Plaintiffs cannot meet their burden.

Plaintiffs allege that Commander Reese and Commander Sund are responsible for training and supervision for officers within the Second District and the Special Operations Division, respectively. Am. Compl. ¶¶ 208; 211. With respect to Commander Reese, Plaintiffs allege that the incident with the street musician in Georgetown "should have indicated" to Commander Reese that additional training and supervision were necessary, but that he nevertheless failed to train and supervise his officers. *Id.* ¶¶ 212-13. With respect to Commander Sund, Plaintiffs assert that because the "Special Operations Division is frequently called upon to monitor First Amendment activity," Commander Sund was aware that training and supervision was necessary to ensure that First Amendment rights were not inhibited but failed to do so. *Id.* ¶¶ 209-10.

These allegations are insufficient to state a claim against Commander Reese or Commander Sund. To show deliberate indifference, Plaintiffs must show a pattern of violations that were caused by a failure to train, and that the inadequacy of training was so obvious that constitutional violations were likely to result. *Estate of Davis ex rel. McCully v. City of North Richland Hills*, 406 F.3d 375, 381 (5th Cir. 2005); *see also Tuttle*, 471 U.S. at 813 (evidence of a single incident in and of itself is insufficient to impose liability). Plaintiffs have, at the most, highlighted a single violation of which Commander Reese was aware. Plaintiffs point to no incidents of First Amendment violations that would be known to Commander Sund. Rather, the

opposite inference is more plausibly drawn from Plaintiffs' pleading: that the Special Operations Division, as the unit "frequently called upon to monitor First Amendment activity," apparently is adequately trained and supervised as Plaintiffs do not contend that that there was a pattern of First Amendment violations by the subordinate officers. Thus, Plaintiffs have not "raise[d] a right to relief above a speculative level" with respect to either Commander Sund or Commander Reese. *Twombly*, 550 U.S. at 554-55.

Plaintiffs assert that Mr. Waldt, as Director of the Continuing Education Branch of the Metropolitan Police Academy, is responsible for ensuring the training of all sworn members. Am. Compl. ¶ 214. They contend that Mr. Waldt "knew or should have known that training was necessary to ensure that the Blocking Passage law was not enforced in a manner that inhibits First Amendment activity" and that "[s]pecifically" he should have been aware of the February 1, 2012 Council hearing, the concerns raised by the ACLU, and the incident involving the street musician. *Id.* ¶ 216. As explained *supra*, these same allegations were insufficient to show the District's deliberate indifference; thus, the facts cannot prove that Mr. Waldt was deliberately indifferent, particularly where Plaintiffs bear an even higher burden for supervisory liability insofar as they must show that "'absent effective supervision, harm was not merely foreseeable, but was highly likely, given the circumstances of the case.'" *Robinson*, 403 F. Supp. 2d at 50 (quoting *Haynesworth*, 820 F.2d at 1261). Plaintiffs fall far short of their burden in this regard. Plaintiffs likewise do not meet the basic pleading standard insofar as they fail to plead facts that could show that any action or inaction of Mr. Waldt, after his purported knowledge of issues on February 1, 2012, actually caused the alleged constitutional deprivations that took place on April 10-13, 2012. Thus, Plaintiffs fail to allege facts, beyond mere speculation, to support an essential element of their claim.

### 4. The Individual MPD Defendants Are Entitled to Qualified Immunity

In the event that the Court deems that the Plaintiffs have stated a claim against any MPD

Defendant for a constitutional tort, the Court should also find that the individuals are entitled to

qualified immunity as Plaintiffs have not pled facts to support a claim that the individuals

knowingly violated any clearly established right afforded the Plaintiffs.

Qualified immunity shields government officials "from liability for civil damages insofar

as their conduct does not violate clearly established statutory or constitutional rights of which a

reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see

also Anderson v. Creighton*, 483 U.S. 635, 638 (1987) (qualified immunity will protect officials

from damages "as long as their actions could reasonably have been consistent with the rights

they are alleged to have violated."). "Because qualified immunity is 'an immunity from suit

rather than a mere defense to liability . . . it is effectively lost if a case is erroneously permitted to

go to trial.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Mitchell v. Forsyth*, 472

U.S. 511, 526 (1985) (emphasis deleted)). Accordingly, courts appropriately resolve issues of

qualified immunity at the earliest possible stage in litigation. *See Saucier v. Katz*, 533 U.S. 194,

201 (2001) (quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (*per curiam*)).[25]

Moreover, qualified immunity "applies regardless of whether the government official's

error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and

fact.'" *Pearson*, 555 U.S. at 231. Qualified immunity thus "gives government officials

breathing room to make reasonable but mistaken judgments," *Ashcroft v. al-Kidd*, 131 S. Ct.

---

[25] In *Saucier*, 533 U.S. at 201, the Supreme Court articulated a two-step inquiry for determining whether a government official was entitled to qualified immunity. First, the Court must consider whether Plaintiff could establish a violation of a constitutional right. *Id.* If so, the Court must then determine whether the right was "clearly established" at the time of the alleged violation. *Id.* In *Pearson*, the Supreme Court held that the two-step process is no longer mandatory, and that a trial court may determine the appropriate sequence of the inquiry in light of the issues before the court. *Pearson*, 555 U.S. at 236.

2074, 2085 (2011), and it "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

The determination of whether a constitutional right was "clearly established" "depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified." *Anderson*, 483 U.S. at 639. In making this determination, "courts must not define the relevant constitutional right in overly general terms, lest they strip the qualified immunity defense of all meaning." *Butera v. District of Columbia*, 235 F.3d 637, 646 (D.C. Cir. 2001). If the right is defined too broadly, "[p]laintiffs would be able to convert the rule of qualified immunity that our cases plainly establish into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." *Atherton v. District of Columbia*, 567 F.3d 672, 690 (D.C. Cir. 2009) (quoting *Anderson*, 483 U.S. at 639); *see also Butera*, 235 F.3d at 646. Put otherwise, the constitutional right must be identified "at the appropriate level of specificity" for a court to determine whether the right was "clearly established." *Butera*, 235 F.3d at 646 (internal citations and quotations omitted) (quoting *Wilson v. Layne*, 526 U.S. 603, 615 (1999)). "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson*, 483 U.S. at 640. "'This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent.'" *Id.* (internal citations omitted) (the Court of Appeals erred in defining the constitutional right as the "general right" "to be free from warrantless searches of one's home unless the searching officers have probable cause and there are exigent circumstances" and that "it was not clearly established that the circumstances with which [the officer] was confronted did not constitute probable cause and exigent circumstances"); *see also Butera*, 235 F.3d at 647 (the District Court

erred by "defining the constitutional rights as [plaintiff's] right to life, bodily integrity, personal security, and personal privacy, and as [his mother's] 'liberty interest' in the companionship of her son" because "[a]lthough courts have acknowledged the existence of these *general rights* in certain circumstances, … *they are overly broad where a qualified immunity defense is asserted*.") (internal citations omitted) (emphasis added).

Thus, here, the Court must first properly define the constitutional right at issue to ensure that the right is not defined in "overly general terms," thereby rendering the qualified immunity defense a nullity. *See Butera*, 235 F.3d at 646. To the extent that Plaintiffs have successfully alleged any constitutional violations against any of the individual MPD Defendants, they are entitled to qualified immunity.

As discussed, even conduct protected by the First Amendment may be regulated by reasonable time, place and manner restrictions.[26] Where a reasonable time, place, and manner restriction is imposed but not followed, the Blocking Passage law permits an officer to make an arrest. Plaintiffs admit that they were sitting on a portion of the sidewalk, and that they declined to follow the orders of the various officers to move. They contend that the officers were told by officials advised by attorneys in the Office of the Attorney General that the statute "could be properly applied to arrest protestors who were 'blocking' a sidewalk simply by sitting on the ground, no matter how small a percentage of the sidewalk they took up or how much space pedestrians had to maneuver around them." Am. Compl. ¶ 83. Thus, the qualified immunity analysis turns on whether arresting Plaintiffs for blocking a portion of the sidewalk violates a clearly established right of which a reasonable officer should have been aware.

---

[26] The District Defendants contend that no right was violated as the officers applied a reasonable time, place, and manner restriction, as discussed *supra* in Section I.C, and the District Defendants incorporate those arguments by reference here in support of qualified immunity. Thus, this section assumes that, even if a right afforded Plaintiffs was violated, the officers are entitled to qualified immunity because the right was not clearly established at the time of the arrests.

It is far from clearly established in this jurisdiction that an individual may not be arrested unless he or she is completely blocking, incommoding, or obstructing passage on a street or sidewalk.  Or, conversely, the officers did not violate clearly established law by arresting the Plaintiffs for their admittedly partial obstruction of the sidewalk.  In fact, the D.C Court of Appeals has upheld convictions under the former disorderly conduct statute where the arrests were of individuals who were not completely blocking entrances to a building.  *See Tetaz v. District of Columbia*, 976 A.2d 907 (D.C. 2009).  Moreover, the Supreme Court has held that expressive activities, such as picketing and parading, "are subject to regulation even though intertwined with expression and association," and that "[t]he control of travel on the streets is a clear example of governmental responsibility" to maintain public order.  *Cox v. Louisiana*, 379 U.S. 559, 563 (1965); *see also id.* at 564 (The statute "deal[s] with conduct subject to regulation so as to vindicate important interests of society and … the fact that free speech is intermingled with such conduct does not bring with it constitutional protection.").

When considering that the government can punish peaceful demonstrators on jailhouse grounds, *see Adderley v. Florida*, 385 U.S. 39 (1966); peaceful protestors "near" a courthouse, *Cox*, 379 U.S. at 557-58; and those interfering with traffic on public ways, *Cox v. New Hampshire*, 312 U.S. 569 (1941), it cannot be said that a reasonable law enforcement officer should think that arresting a protestor for partial incommoding violates a clearly established right.  *Cf. White*, 679 F. Supp. at 1152 (rejecting argument that local blocking passage regulation was not narrowly tailored when applied to demonstrators who were not blocking the entire sidewalk).  Rather, it is clearly established that the conduct here could be regulated by the police,

and because it is not clearly established that partial blocking of the sidewalk was not sufficient to arrest Plaintiffs under the statute, the officers are entitled to qualified immunity.[27]

Qualified immunity also applies to the alleged Fourth Amendment violation: if it was not clearly established that the officers could not arrest for partial blocking, and the statute encompasses partial blocking, and Plaintiffs admit to partial blocking, there is no Fourth Amendment violation. Here, the arresting officers had probable cause to believe that Plaintiffs were in violation of the Blocking Passage law, which, by its terms, permits arrest even if the sidewalk is not blocked completely.

Regarding Plaintiffs' Fifth Amendment claim against the individual Defendants, Plaintiffs cannot show that the individual District defendants violated clearly established federal law, and they are therefore entitled to qualified immunity on Plaintiffs' class-of-one claim. As noted above, the relevant inquiry is "whether it would be clear to a reasonable officer [at the time of the alleged constitutional violation] that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202. As the Seventh Circuit has explained, "in cases where an officer uses his discretion to choose which, among several violators to arrest[,]" qualified immunity will "frequently relieve the [officer] of the burden of litigation in [the area of class-of-one equal protection]." *Thayer v. Chiczewski*, 697 F.3d 514, 532 (7th Cir. 2012). Indeed, where discretion is by its nature broad, "it will be difficult to show both a violation of a constitutional right and the clearly established nature of that right." *Id.* (quoting *Marcelle*, 680 F.3d at 915 (Wood, J., dissenting)). Such are the circumstances here.

---

[27] As stated, Plaintiffs allege that Lt. Scott, Cmdr. Sund, and Capt. Shelton were given legal advice that arrests for partial blocking were permitted. Am. Compl. 82-83. Thus, the decision-making officials relied on legal advice of government attorneys when making their arrest decisions. While "reliance by police officers upon the advice of a representative from the Attorney General does not provide absolute immunity, [] it does factor into the qualified immunity analysis, along with all of the other facts and circumstances." *Wesby v. District of Columbia*, 841 F. Supp. 2d 20, 43 (D.D.C. 2012); *see also Cox v. Hainey*, 391 F.3d 25, 34 (1st Cir. 2004). The fact that legal advice was sought and relied upon, coupled with the fact that it is not clearly established that the interpretation of the law provided to the officials would violate constitutional rights, entitles the officers to qualified immunity.

As a matter of fact, there is no relevant authority whatsoever that would have put the individual District defendants on notice that arresting Plaintiffs pursuant to D.C. Code § 22-1307, while failing to arrest other "innumerable individuals" present on sidewalks throughout the District, would violate a clearly established equal protection right. Am. Compl. ¶ 327. To the contrary, as explained above, the Supreme Court has expressly stated that at least some forms of law enforcement decisionmaking are not subject to equal protection review because they fall into a category of state action that is inherently "based on a vast array of subjective, individualized assessments." *Engquist*, 533 U.S. at 603-04 ("allowing an equal protection claim on the ground that a [traffic] ticket was given to one person and not others, even if for no discernible or articulable reason, would be incompatible with the discretion inherent in the challenged action"). While *Engquist* was certainly not intended to safeguard all law enforcement activities from scrutiny under the equal protection clause, it at least informs the exercise of police discretion that is necessarily inherent in the application of D.C. Code § 22-1307. After *Engquist*, a reasonable officer could certainly have believed that Plaintiffs' arrests, which are not even alleged to have been motivated by subjective ill will (but rather "irrational and arbitrary" police decisionmaking, *see* Am. Compl. ¶ 328), were lawfully affected under the circumstances. *See Tate v. District of Columbia*, 601 F. Supp. 2d 132, 137 (D.D.C. 2009) (quoting *Jicarilla Apacche Nation v. Rio Arriba Cnty.*, 440 F.3d 1202, 1210 (10th Cir. 2006) for the proposition that "[e]ven if subjective ill will is a necessary condition for a class-of-one claim, it is not a sufficient one"), *affirmed in part, remanded in part*, 627 F.3d 904 (D.C. Cir. 2010). Given the uncertainty in the law after *Engquist*, the individual District defendants are shielded by qualified immunity on Plaintiffs' class-of-one equal protection challenge, and Count V of the amended complaint must be dismissed as to them. *See Thayer*, 697 F.3d 514 at 533 ("[g]iven the uncertainty in the law and

the unique factual situation [surrounding the plaintiff's arrest], the constitutional question was not beyond dispute," and the defendants-arresting officers were thus entitled to qualified immunity as to the plaintiff's class-of-one claim).

### III. The District Defendants Are Entitled to Judgment on Plaintiffs' Common Law Claims

#### A. False Arrest/Imprisonment (Count I)

The elements of a constitutional claim for false arrest are substantially identical to the elements of a common-law false arrest claim." *Scott v. District of Columbia*, 101 F.3d 748, 753 (D.C. Cir. 2006). And there is "no real difference as a practical matter between false arrest and false imprisonment." *Shaw v. May Dep't Stores Co.*, 268 A.2d 607, 609 n.2 (D.C. 1970) (citations omitted). As with a constitutional claim for false arrest, "[t]he focal point of the action is the question whether the arresting officer was justified in ordering the arrest of the plaintiff[s]; if so, the conduct of the arresting officer is privileged and the action fails." *Scott*, 101 F.3d at 753 (quoting *Dellums v. Powell*, 566 F.2d 167, 175 (D.C. Cir. 1977)). Thus, "probable cause for an arrest and detention constitutes a valid defense to a claim of false arrest or imprisonment." *Magwood v. Giddings*, 672 A.2d 1083, 1086 (D.C. 1996).

Based solely upon Plaintiffs' characterization of the relevant events as alleged in the amended complaint, their arrests pursuant to D.C. Code § 22-1307 were supported by probable cause, which is fatal to their claim of false arrest/false imprisonment. As discussed throughout this brief, D.C. Code § 22-1307 expressly authorizes the arrest of a person "crowding, obstructing, or incommoding after [the person is] instructed by a law enforcement officer to cease" the proscribed activity. And according to Plaintiffs, the individual arresting officers were instructed by attorneys with the Office of the Attorney General, prior to Plaintiffs' arrests, that partial "crowding, obstructing, or incommoding" of a public way fell within the conduct that the

statute was intended to reach.  *See* Am. Compl. ¶ 83.  Furthermore, on Plaintiffs' own account, they were at least partially "crowding, obstructing, or incommoding" the sidewalk in front of Bank of America, *see e.g.*, *id.* at ¶ 160 (Plaintiffs "were sitting in a row parallel and immediately next to the outer wall of the building . . . taking up approximately 2.5' . . . of the sidewalk"), and they continued to "crowd, obstruct, or incommode . . . after being instructed by [the officers] to cease" and disperse, *see e.g.*, *id.* at ¶ 166 ("one MPD officer told the group that if they did not move they would be arrested for blocking passage").  Thus, the amended complaint itself demonstrates that the individual District defendants had probable cause to arrest Plaintiffs.  At a minimum, the foregoing facts plausibly support a finding that the arrests were supported by a reasonable, good faith belief that probable cause existed, even if it ultimately did not.

In light of the foregoing, Plaintiffs have not stated a viable claim for false arrest or imprisonment, and Count I of the amended complaint must be dismissed accordingly.  *See Minch v. District of Columbia*, 952 A.2d 929, 937 (D.C. 2008) (an officer will be "immune from claims for both false arrest and false imprisonment if it can affirmatively demonstrate either that probable cause existed to arrest or that the arresting officer believed, reasonably and in good faith, that probable cause existed").

### B.  Abuse of Process  (Count II)

"Under District of Columbia law, abuse of process occurs when 'process has been used to accomplish some end which is without the regular purview of the process, or which compels the party against whom it is used to do some collateral thing which he could not legally and regularly be required to do.'"  *Moore v. United States*, 213 F.3d 705, 712 (D.C. Cir. 2000) (quoting *Jacobson v. Thrifty Paper Boxes, Inc.*, 230 A.2d 710, 711 (D.C. 1967) (other citation omitted)).  The Circuit has observed that the "critical concern" of the tort is 'whether the process

was used to accomplish an end unintended by law." *Id.* (quoting *Morowitz v. Marvel*, 423 A.2d 196, 198 (D.C. 1980)); *see also Scott*, 101 F.3d at 755 ("The essence of the tort of abuse of process is the use of the legal system 'to accomplish some end which is without the regular purview of the process.'") (quoting *Brown v. Hamilton*, 601 A.2d 1074, 1079 (D.C. 1992)). "There is no action for abuse of process when the process is used for the purpose for which it is intended, but there is an incidental motive of spite or an ulterior purpose of benefit to the defendant." *Scott*, 101 F.3d at 755 (quoting Restatement (Second) of Torts § 682 cmt. b. (1977)).

Here, Plaintiffs' contend that Lt. Scott, Capt. Shelton, and Cmdr. Sund conspired with each other and the private individual defendants to "have the plaintiffs arrested and to induce the prosecution of the plaintiffs to achieve an end not contemplated by criminal prosecution, namely to chill and deter the plaintiffs and other individuals from exercising their First Amendment rights by continuing their sleepful protest." Am. Compl. ¶ 255. Thus, Plaintiffs link their abuse of process claim to the facts pled in support of their conspiracy theory which, as demonstrated above in Section II.C.2, cannot survive for lack of plausibility.[28]

### C. Negligent Training and Supervision  (Count III)

Plaintiffs also seek to assert a claim of negligent training and supervision against the District, Mr. Waldt, Commander Reese and Commander Sund.  "To establish a cause of action for negligent supervision, a plaintiff must show:  that the employer 'knew or should have known its employee behaved in a dangerous or otherwise incompetent manner, and that the employer, armed with that actual or constructive knowledge, failed to adequately supervise the employee." *Phelan v. City of Mount Rainer*, 805 A.2d 930, 937-38 (D.C. 2002) (quoting *Giles v. Shell Oil*

---

[28] The District Defendants also incorporate by reference the arguments set forth by the Bank of America Defendants and the Akridge Defendants, to the extent not inconsistent with the arguments made by the District Defendants, in support of the District Defendants' arguments that the abuse of process and conspiracy claims must be dismissed.

*Corp.*, 487 A.2d 610, 613 (D.C. 1985)). Here, Plaintiffs set forth no contentions that would establish that the District, Mr. Waldt, or Commanders Reese or Sund knew or had reason to know that any of the other individual officers behaved in a "dangerous or incompetent manner" that would justify the need for additional supervision. Thus, Plaintiffs fail to meet an essential element of their claim.

Dismissal is also appropriate as the Defendants are absolutely immune from common law claims, such as claims for training and supervision, that are related to discretionary government functions. *See Cox v. District of Columbia*, 1991 WL 258173 (D.D.C. Nov. 22, 1991). In *Cox*, the Court noted that absolute immunity was appropriate where "'the official acted within the "outer perimeter" of his official duties, and [] the particular government function at issue was "discretionary" as opposed to "ministerial."'" *Cox*, at 4 (quoting *Moss v. Stockard*, 580 A.2d 1011, 1020 (D.C. 1990). The court observed absolute immunity applied because (1) a "supervisor's authority concerning training" falls with the category of "matters committed by law to the official's control or supervision or is 'governed by a lawful requirement of the department under whose authority the officer is acting;'" *id.* (quoting *Moss*, 580 A.2d at 1020); and (2) training and supervision fell within the discretionary domain as "formulation" of policy, as compared to "execution" of policy. The same analysis applies here to provide absolute immunity for Plaintiffs' claims of negligent training and supervision, as discretionary functions of the government. *See also Burkhart v. WMATA*, 112 F.3d 1207, 1217 (D.C. Cir. 1997) ("decisions concerning the hiring, training and supervising of…employees are discretionary in nature, and thus immune from judicial review."); *accord Tookes v. United States*, 811 F. Supp. 2d 322 (D.D.C. 2011); *Bragdon v. United States*, 537 F. Supp. 2d 157 (D.D.C. 2008); *Karriem v. District of Columbia*, 641 F. Supp. 2d 394 (D.D.C. 1986)

## IV.  Plaintiffs Are Not Entitled to Declaratory or Injunctive Relief

### A.  Plaintiffs Lack Standing to Pursue Equitable Relief

Plaintiffs do not have standing to pursue the declaratory and injunctive relief sought in Count VII of the amended complaint.  In order to establish standing, the party invoking federal jurisdiction bears the burden of demonstrating the "irreducible constitutional minimum" requirement of (1) personal injury-in-fact, (2) causation, and (3) redressability.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992).  As the Supreme Court explained in *Los Angeles v. Lyons*, a plaintiff does not have the requisite injury-in-fact to establish standing to seek injunctive relief unless he shows a "real or immediate threat that [he] will be wronged again." 461 U.S. 95, 111 (1983).[29]  Standing to seek injunctive relief must be analyzed separately from standing to seek retrospective relief.  *See id.* at 111-12.  And according to the law of this circuit, the *Lyons* standard applies equally to injunctive and declaratory relief.  *See Haase v. Sessions*, 835 F.2d 902, 911 (D.C. Cir. 1987) ("[a]lthough *Lyons* and its predecessors involved injunctive relief, whereas [the plaintiff] seeks declaratory relief, we do not distinguish *Lyons* on this basis").

Plaintiffs' general allegations of a threat of future harm do not show a sufficient injury-in-fact to establish standing under *Lyons*.  In a subsection titled "*Future protests by the plaintiffs*," the amended complaint provides, in essence, that Plaintiffs Jewler, Knight, and Eister

---

[29] In *Lyons*, the plaintiff sued after being choked by a Los Angeles County police officer, alleging violations of his Fourth, Fifth, Eighth, and Fourteenth Amendment rights.  461 U.S. at 98.  Holding that *Lyons* lacked standing to seek prospective injunctive relief, the Supreme Court explained:

> Lyons would have had not only to allege that he would have another encounter with the police but also to make the incredible assertion either (1) that all police officers in Los Angeles always choke any citizen with whom they happen to have an encounter, whether for the purpose of arrest, issuing a citation, or for questioning, or (2) that the City ordered or authorized police officers to act in such manner.

*Id.* at 105-106.  *Lyons* injury, however, was in the past, and he had not alleged a sufficient likelihood that he would suffer future injury. Specifically, the Court found that any likelihood rested on contingent events occurring at some time in the future: namely, that plaintiff himself would again be stopped by the police and would again be choked without any provocation or legal excuse.  *Id.* at 106 n.7.

either intend to engage in (or are foregoing) future protest activities as a result of the threat that they will be arrested again pursuant to D.C. Code § 22-1307. *See* Amend. Compl. ¶¶ 218-224. These types of assertions have been squarely rejected by *Lyons* and its progeny as insufficient to establish standing to seek equitable relief. *Chang v. United States*, 738 F. Supp. 2d 83, 91 (D.D.C. 2010). The foregoing allegations depend, at a minimum, upon future contingent events including the existence of such an event located on a District sidewalk, Plaintiffs' attendance at any such event, and that, while in attendance, Plaintiffs will be arrested and charged with violating D.C. Code § 22-1307. "This sequence of hypothetical future events is indistinguishable from that found insufficient to establish standing in *Lyons*." 738 F. Supp. 2d at 91 (so holding upon comparable facts); *see also supra* at n.29 (discussing holding of *Lyons*). Because Plaintiffs cannot establish a "real or immediate threat that [they themselves] will be wronged again" by the challenged conduct, *Lyons*, 461 U.S. at 111, they lack standing to seek equitable relief, and Count VII must be dismissed for lack of subject matter jurisdiction.

## B. Plaintiffs' Official Capacity Claims Should Be Dismissed

Count VII of Plaintiffs' first amended complaint, which seeks duplicative equitable relief against the District and official capacity defendants Chief Lanier and Attorney General Nathan, should be dismissed as to the named officials. Generally speaking, "[c]laims brought against [District] employees in their official capacity are treated as claims against the [District] and serve no independent purpose when the government is also sued." *Simba v. Fenty*, 754 F. Supp. 2d 19, 22 (D.D.C. 2010) (Roberts, J.) (citations and internal quotations omitted) (dismissing District officials from suit where claims for damages and equitable relief where the complaint also named the District which was "in effect, the real party being sued"). Summary dismissal of redundant official capacity actions is therefore "'the overwhelming approach that has been taken

by members of this Court, as well as the position taken by other courts.'" *Brown v. Corrections Corp. of Am.*, 603 F. Supp. 2d 73, 79 (D.D.C. 2009) (*quoting Price v. District of Columbia*, 545 F. Supp. 2d 89, 94 (D.D.C. 2008)) (dismissing § 1983 claim against District Official in his official capacity as maintaining the claim was "unnecessary and inefficient").[30]  Indeed, the "norm in this jurisdiction" requires a "meaningful reason to take a *different* approach," *Price*, 545 F. Supp. 2d at 95 (emphasis added), and, as set forth below, no such reason exists here.

Plaintiffs' claim for injunctive and declaratory relief against Chief Lanier and Attorney General Nathan is entirely duplicative of the same as alleged against the District, and there is no ancillary justification to retain the named officials as defendants under the circumstances. *See* Amend. Compl. ¶¶ 334-337.  Notably, Chief Lanier and Attorney General Nathan are named in their official capacities *only*, and Plaintiffs have made no allegation that either official was involved in any of the incidents described in the amended complaint. *See id*.  In fact, the amended complaint is totally devoid of any factual allegations whatsoever regarding the named officials, indicating that they were sued only as another means of asserting Count VII against the District. *See id*. at ¶¶ 45-231 ("STATEMENT OF FACTS"); *accord Holmes-Ramsey v. District of Columbia*, 747 F. Supp. 2d 32, 42 (D.D.C. 2010) ("the Complaint's omission of any factual

---

[30] *See e.g., Jefferies v. Dist. of Columbia,* 11-cv-1159, 2013 WL 66085 (D.D.C. Jan. 7, 2013) (dismissing claims against Chief of Police as redundant where District has also been named); *Day v. District of Columbia*, 10-cv-2250 ESH, 2012 U.S. Dist. LEXIS 18213, at *96-97 (D.D.C. Feb. 14, 2012) (dismissing official capacity claims for equitable relief and damages as redundant of claims against the District "for reasons of judicial economy and lack of prejudice"); *Trimble v. Dist. of Columbia*, 779 F. Supp. 2d 54, 58 n. 3 (D.D.C. 2011) (Roberts, J.) (dismissing claims against a District officials "[b]ased upon the understanding that it is duplicative to name both a government entity and the entity's employees"); *Holmes-Ramsey v. District of Columbia*, 747 F. Supp. 2d 32, 42 (D.D.C. 2010) (finding "no reason to deviate" from the "norm" and dismissing claims against the Mayor and District official as duplicative of claims against the District); *Hazel v. Lappin*, 614 F. Supp. 2d 66, 69 (D.D.C. 2009) (summarily dismissing Federal officials sued in their official capacities and treating plaintiffs' *Bivens* action "as if it were brought against the federal government directly"); *Hardy v. District of Columbia*, 601 F. Supp. 2d 182, 186-87 (D.D.C. 2009) (Roberts, J.) ("Because plaintiffs [made] the same claims against the District of Columbia, the same claims against [former District officials] in their official capacities [were] redundant and . . . dismissed"); *see also Price*, 545 F. Supp. 2d at 94 (collecting cases).  *But see Johnson v. Dist. of Columbia*, 572 F. Supp. 2d 94, 112 (D.D.C. 2008) (denying a motion to remove Mayor as a named defendant, noting that such removal is permissible but not required), *amended on reconsideration in part* 632 F. Supp. 2d 20 (D.D.C. 2009).

allegations regarding the Officials indicates that . . . inclusion of the Officials as defendants [was] redundant and an inefficient use of judicial resources").  In light of the foregoing, there is simply no reason to suppose that Plaintiffs' official capacity claim against Chief Lanier and Attorney General Nathan is in any way distinct from Plaintiffs' claim for equitable relief against the District.  Nor are there grounds to conclude that the official capacity defendants are necessary for the Court to grant effective relief.  As such, for the reasons of judicial economy and lack of prejudice, and consistent with the "overwhelming approach that has been taken by members of this Court," *Brown*, 603 F. Supp. 2d at 79, Count VII of Plaintiffs' first amended complaint should be dismissed as redundant as to Chief Lanier and Attorney General Nathan.

## CONCLUSION

For the reasons set forth above, and in the filings of the Bank of America Defendants and the Akridge Defendants, Plaintiffs' amended complaint should be dismissed in its entirety.

Respectfully submitted,

IRVIN B. NATHAN
Attorney General for the District of Columbia

ELLEN A. EFROS
Deputy Attorney General, Public Interest Division

*/s/* Melissa L. Baker
MELISSA L. BAKER (499368)
Acting Section Chief, Equity Section

 /s/  Shana L. Frost
SHANA L. FROST (458021)
Assistant Attorney General
441 4th Street, NW
Washington, DC 20001
(202) 724-6534
Fax:  (202) 741-8934
shana.frost@dc.gov

/s/ Matthew R. Blecher

MATTHEW R. BLECHER [admitted to the District of Columbia Bar; Bar Number pending]

Assistant Attorney General

Equity Section, Public Interest Division

441 Fourth Street, N.W., Suite 600S

Washington, D.C. 20001

Phone: (202) 442-9774

Fax:  (202) 730-0586

Email: matthew.blecher@dc.gov

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
　　　　　　　　　　　　　　　　)
**SAMUEL JEWLER**, *et al.*　　　　)
　　　　　　　　　　　　　　　　)
　　　　　　**Plaintiffs,**　　　　)
　　　　　　　　　　　　　　　　)　　**C.A. No. 12-1843 (RWR)**
　　　**v.**　　　　　　　　　　)
　　　　　　　　　　　　　　　　)
**DISTRICT OF COLUMBIA**, *et al.*,　)
　　　　　　　　　　　　　　　　)
　　　　　　**Defendants.**　　　)
_____)

## ORDER

Before the Court is the District of Columbia's Motion to Dismiss Plaintiffs' Amended

Complaint.  Upon consideration of the motion and any opposition or reply thereto, it is this ___

day of _____, 2013:

　　　　**ORDERED** that the District of Columbia's Motion be and hereby is **granted**; and it is

　　　　**FURTHER ORDERED** that this matter be and hereby is **dismissed with prejudice** as

to the District Defendants.




　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　Richard W. Roberts
　　　　　　　　　　　　　　　United States District Judge

Copies served upon counsel of record via ECF