UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SAMUEL JEWLER, *et al.,* | |
| Plaintiffs, | |
| v. | No. 12-cv-1843 (RWR) |
| DISTRICT OF COLUMBIA, *et al.,* | |
| Defendants. | |

**MEMORANDUM OF THE AMERICAN CIVIL LIBERTIES UNION
OF THE NATION'S CAPITAL, AS *AMICUS CURIAE***

The American Civil Liberties Union of the Nation's Capital submits this
memorandum, as *amicus curiae*, in opposition to defendants' motion to dismiss the
complaint in this action.

**INTEREST OF AMICUS**

The American Civil Liberties Union ("ACLU") is a nationwide non-profit
organization of approximately 500,000 members that for more than 90 years has been
devoted to protecting the civil liberties of all Americans, particularly their right to free
expression under the First Amendment.  The American Civil Liberties Union of the
Nation's Capital is the Washington, D.C., affiliate of the ACLU, and it has often
represented parties and filed *amicus* briefs in the courts of this jurisdiction in support of
those goals.

*Amicus* has long been concerned about the misuse of the District of Columbia's
disorderly conduct law, particularly — although not limited to — its misuse against
individuals engaged in demonstration or protest activities.  In 2010, the D.C. Council

enacted a comprehensive revision of the disorderly conduct law, including the Blocking

Passage provision involved in this case.  As the report of the Council's Judiciary

Committee acknowledges, "The genesis of the Committees work dates to a letter from the

American Civil Liberties Union of the Nation's Capital asking that §§ 22-1307 and 22-

1321 be revised . . . ."  Council of the District of Columbia, Committee on Public Safety

and the Judiciary, REPORT ON BILL 18-425, THE DISORDERLY CONDUCT AMENDMENT ACT

OF 2010 ("Committee Report") (November 18, 2010), at 2.[1]  The ACLU was deeply

involved in the legislative process leading to the revision of the law, serving on a working

group set up at the request of the Judiciary Committee and under the auspices of the

Council for Court Excellence that also included the D.C. Attorney General's office, the

U.S. Attorney's office, the Metropolitan Police Department, the D.C. Public Defender

Service, and the Pretrial Services Agency.  *See id*.  *Amicus* is therefore familiar with the

issues presented by the defendants' pending motion to dismiss.

     In *amicus'* view, the facts alleged in the complaint make out a clear violation of

plaintiffs' First Amendment rights.  Their arrests were premised on an application of the

District of Columbia disorderly conduct statutes that is incorrect as a matter of statutory

construction and also substantively unconstitutional.  *Amicus* hopes its explanation for

that conclusion will be helpful to the Court in ruling on defendants' motion to dismiss the

complaint.

---

[1]  The Committee Report is available at http://dcclims1.dccouncil.us/lims/searchby
legislation.aspx.  (Type "B18-425" in the search box, then click on "Committee Report.")
Relevant excerpts of the Committee Report are attached as Exhibit A.

**STATEMENT**

As relevant to the issues addressed in this memorandum, the Amended Complaint alleges that the plaintiffs were arrested on April 10-13, 2012, because they were sitting on the public sidewalk in front of a Bank of America branch office located at 1090 Vermont Avenue, N.W., and in most cases holding signs critical of the bank.  They were charged with violating the "Blocking Passage" provision of the District of Columbia disorderly conduct statute, D.C. Code § 22-1307, although they were not blocking anyone's passage and were occupying only a very small fraction of the width of the sidewalk (about 2.5 feet, or about 6%, of the 40-foot-wide sidewalk), adjacent either to the building wall or to a flower box.  *See* Amended Complaint ¶¶ 90, 97-99, 102 (April 10 arrests); ¶¶ 112, 130 (April 11 arrests); ¶¶ 143, 149-152 (April 12 arrests); ¶¶ 159, 160-165, 168 (April 13 arrests); ¶ 60 (40-foot width of sidewalk).  In ruling on defendants' motion to dismiss, those factual allegations must be accepted as true.[2]

In their motion to dismiss ("MTD"), defendants argue that plaintiffs' "arrests pursuant to D.C. Code § 22-1307 were supported by probable cause," MTD at 52, and that in any event the defendant officers are entitled to qualified immunity because they "reasonably believed that Plaintiffs' conduct violated D.C. Code § 22-1307," *id*. at 27, as "[i]t is far from clearly established in this jurisdiction that an individual may not be arrested unless he or she is completely blocking, incommoding, or obstructing passage on a street or sidewalk."  *Id*. at 49.

---

[2]  Attached as Exhibit B is a photograph that *amicus* understands depicts the scene on the sidewalk on April 10, just before the arrests were made.  The photograph is not in the record at this stage of the litigation and is not submitted as evidence of the truth of the scene it depicts; it is attached only as a visual aid to understanding the facts alleged in the Amended Complaint regarding the position of the plaintiffs on the sidewalk and the amount of the sidewalk they occupied.

**ARGUMENT**

Contrary to defendants' argument, it has long been clearly established in this jurisdiction that violation of the Blocking Passage statute requires *blocking passage*.  For that reason, plaintiffs' arrests were not supported by probable cause, and no reasonable police officer reasonably could have believed that Plaintiffs' conduct, as alleged in the Amended Complaint, violated D.C. Code § 22-1307.  It follows that their arrests were false and that their seizures violated their rights under the Fourth Amendment.

Additionally, it is clear that plaintiffs' peaceful communicative activity in a traditional public forum was protected by the First Amendment.  Defendants argue that the Blocking Passage statute is a constitutionally valid regulation of time, place and manner because it is narrowly tailored to serve a substantial governmental interest.  That would be true if the statute were properly interpreted to prevent *blocking passage*.  But as defendants interpret the statute — to criminalize conduct that involves *no blocking* — their argument fails.

**I.  Violation of the Blocking Passage Statute Requires *Blocking Passage*.**

    **A.  It has been clearly established for nearly a century that "incommoding" requires the actual blocking of passage.**

It has been clearly established in this jurisdiction, since long before any of the plaintiffs or defendants were born, that simply occupying a small part of a public sidewalk, without actually blocking passage, does not violate the Blocking Passage portion of the D.C. disorderly conduct statute.

In 1918, the court of appeals considered the sufficiency of a criminal information charging that certain defendants "did congregate and assemble on Pennsylvania avenue, N. W., [and] did then and there crowd, obstruct, and incommode the free use of the

sidewalk thereof on said avenue. Contrary to and in violation of an Act of Congress in

such case made and provided." *Hunter v. District of Columbia*, 47 App. D.C. 406, 1918

WL 18180, at *2 (D.C. Cir. 1918).[3]  The statute in question, "An Act for the preservation

of the Public Peace and Protection of Property in the District of Columbia," was the lineal

ancestor of today's disorderly conduct statute, and used operative language that has

remained unchanged:

> [I]t shall not be lawful for any person or persons within the District of
> Columbia to congregate and assemble in any street, avenue, alley, road, or
> highway, or in or around any public building or inclosure, or any park or
> reservation, or at the entrance of any private building or inclosure, and . . .
> *crowd, obstruct, or incommode* the free use of any such street, avenue,
> alley, road, highway, or any of the foot pavements thereof, or the free
> entrance into any public or private building or inclosure.

30 Stat. 723, ch. 638 (July 8, 1898) (emphasis added) (quoted in *Hunter*, 1918 WL

18180, at *1).[4]  The court of appeals found the information defective and ordered it

dismissed, because it "fail[ed] to set out the acts committed by the defendants which

constituted the crowding and obstructing of the free use of the walk." *Id*. at *3.  The

court explained that simply tracking the statutory language was insufficient because it left

open the possibility that the defendants were bring prosecuted for conduct that did not

constitute a crime:  "It would hardly be contended . . . that if defendants had met on one

---

[3]  The court was named the "Court of Appeals of the District of Columbia."  The
Bluebook indicates that it was the predecessor of the D.C. Circuit, not the D.C. Court of
Appeals, and should be designated as "(D.C. Cir.)." *See* The Bluebook at 236 (19th ed.
2010).

[4]  The current Blocking Passage statute uses the same operative language:

> It is unlawful for a person, alone or in concert with others, to *crowd,
> obstruct, or incommode* the use of any street, avenue, alley, road,
> highway, or sidewalk, or the entrance of any public or private building or
> enclosure . . . .

D.C. Code § 22-1307 (emphasis added).

of the spacious sidewalks of Pennsylvania avenue to conduct a peaceable conversation, *though in a degree inconveniencing pedestrians*, they would be guilty, under the statute, of crowding and obstructing the free use of the walk." *Id*. (emphasis added). In the past 95 years, no court has suggested that *Hunter* misconstrued the law. Indeed, the very passage just quoted from *Hunter* was quoted with approval in *Odum v. District of Columbia*, 565 A.2d 302, 304 n.5 (D.C. 1989).

The case cited by defendants, *Tetaz v. District of Columbia*, 976 A.2d 907 (D.C. 2009), is not to the contrary. Defendants claim that *Tetaz* "upheld convictions under the former disorderly conduct statute where the arrests were of individuals who were not completely blocking entrances to a building," MTD at 49, but the evidence relied upon by the court of appeals to uphold the convictions in that case shows defendants' description to be disingenuous:

> The [defendants] were "blocking [the entrance] completely" and occupying seventy percent of the "plaza area adjacent to the entrance." They had pulled white sheets over themselves and had lined up some fifteen mock coffins on the steps to represent victims of war. Lloyd testified that, because the demonstrators lay "right up against the ... first entrance ... to the building," persons entering had to "hop over" them to enter, while others—"diverted away from that entrance"—"went ... around the corner to the South Capitol entrance." The trial judge found that, "while not 100 percent blocked, [the building entrance] was significantly impeded or incommoded" because "people had to pick their way around individuals lying on the ground in sheets," some "less than two or three feet ... from the entryway."

*Tetaz,* 976 A.2d at 911 (alterations in original). The facts in this case (as alleged in the Amended Complaint) closely resemble the scenario relied on in *Hunter* to dismiss the information, and have no resemblance at all to the facts in *Tetaz*. Defendants' argument that the Blocking Passage statute applies (or could reasonably be thought to apply) to the conduct of plaintiffs as described in the Amended Complaint is therefore incorrect.

**B. The MPD defendants were fully aware that the Blocking Passage statute required the actual blocking of passage.**

The D.C. Metropolitan Police Department's own documents make it clear that the defendants were well aware that the Blocking Passage statute requires *blocking passage*.

MPD policy and training materials on the disorderly conduct statutes were produced to the ACLU as counsel for the plaintiff in *Huthnance v. District of Columbia*, 793 F. Supp. 2d 183 (D.D.C. 2011), a case that (as the jury found) involved a false arrest for "contempt of cop" under the disorderly conduct law. While the particular part of the disorderly conduct law involved in that case was the "loud and boisterous" provision, the policy and training materials also covered the blocking passage provision.

Attached as Exhibit C is MPD Special Order 92-9, issued in July 1992, entitled "Enforcement of the 'Incommoding' and 'Failure to Move On' Sections of D.C. Code §22-1107, 1121(2)." On its opening page, it explains:

> INCOMMODING - Means the complete and continuous blocking of a sidewalk or vehicle traffic lane, so that citizens are denied the use of a public passageway. Partial obstruction of a sidewalk that causes inconvenience, but does not prevent people from using the sidewalk is not incommoding.

Exhibit C at 1. An attachment to that Special Order, labeled "Instructional Material," elaborates:

> Incommoding requires the continued blocking of vehicle traffic lanes or the effective, complete blocking of sidewalks or doorways by three or more persons.[5] If the incommoding or obstruction of any block, sidewalk, doorway, or street is to such an extent that citizens are denied the use of these public passageways, such incommoding constitutes a breach of the peace.
>
> * * *

---

[5]   The common-law requirement that "three or more persons" must engage in blocking in order to violate the blocking passage law was eliminated in the 2010 statutory revision, as discussed below at p. 9.

> It is <u>not</u> incommoding for persons to stand or gather on a sidewalk or
> street corner in such a way as to inconvenience others by causing them to
> have to walk around the group on the sidewalk or to say "excuse me" in
> order to pass through.

Exhibit C at 5 (underlining in original).

Attached as Exhibit D is a document entitled "D.C. Criminal Code Handout -

October 2005" from the Maurice T. Turner Jr. Institute of Police Science (the MPD

Police Academy).  The section labeled Disorderly Conduct includes this passage:

> **INCOMMODING:**
> Means the complete and continuous blocking of a sidewalk or vehicle
> traffic lane so that citizens are denied the use of a public passageway.
> Partial obstruction of a sidewalk that causes inconvenience, but does not
> prevent people from using the sidewalk is NOT incommoding.

Exhibit D at 3 (capitalization in original).

Attached as Exhibit E is a printout of a PowerPoint presentation used for MPD in-

service training, entitled "Disorderly Conduct In-Service 2007."  The fourth slide,

captioned "<u>Incommoding/Failure to Move On</u>," states, "Incommoding-continuous

blocking of a sidewalk or vehicle traffic lane by 3 or more people."  The fifth slide,

captioned "<u>Incommoding</u>," states, "Note: Partial obstruction of a sidewalk that causes

momentary inconvenience, but does not prevent people from using the sidewalk is <u>NOT</u>

incommoding."  Exhibit E at 2-3 (capitalization and underlining in original).

Several other MPD training documents, not attached here, repeat the same

unambiguous message:  incommoding requires *blocking* a sidewalk or traffic lane *so that

others cannot use it*.  The arrests of plaintiffs for violation of the "incommoding"

provision of the disorderly conduct statute cannot be reconciled with MPD's own clear

understanding and training about the law.

8

### C.  The recent revision of the disorderly conduct laws did not change the conduct required to violate the Blocking Passage provision.

As noted earlier, the District of Columbia Council revised the disorderly conduct statutes, including the Blocking Passage provision, about a year before the arrests at issue in this case were made.  *See* D.C. Law 18-375, 58 D.C. Register 731 (Jan. 28, 2011), attached as Exhibit F.  But that revision made no change in the language relevant here: "*crowd, obstruct, or incommode.*"  There is therefore no basis for an argument that the new law criminalized the kind of non-obstructive conduct alleged in the Amended Complaint.

To emphasize that no such change was made, the Council explicitly discussed its decision to retain the 19th Century language of "crowd, obstruct, or incommode."  The Judiciary Committee explained:

> The phrase "crowd, obstruct, or incommode" is used because it preserves phrasing in the current law. . . .  By preserving the phrasing in the current law, the bill preserves much of the case law regarding this aspect of disorderly conduct.

Committee Report at 6-7.

The Committee Report also noted that the revision "reverses the judicial interpretation that incommoding must involve a minimum of three persons."  *Id.* at 7.  The Council for Court Excellence working group of which the ACLU was a member unanimously supported that change, recognizing that one or two persons can sometimes effectively block a sidewalk.  *See* Exhibit A at 17 (CCE Report at 7) ("The current statute has been interpreted to require a minimum of three persons engaging in obstructive conduct in order to constitute an offense.  This limitation does not appear to be necessary or desirable.") (footnote omitted).  There is not the slightest hint that this change was

supposed to change the *substantive* meaning of "crowd, obstruct, or incommode."  The

working group certainly would not unanimously have supported a change making it a

crime to sit or stand on any part of a public a sidewalk holding a sign.  Nor would the

Council have adopted such a brazenly unconstitutional amendment, especially when a

major purpose of its revision was to bring the 19th Century disorderly conduct statutes

into line with modern constitutional requirements.

•   •   •

It follows from all of the above that the defendant officers could not have had

probable cause to believe that the plaintiffs had violated the Blocking Passage law, and

could not reasonably have believed that they had probable cause.  The Amended

Complaint therefore states a non-dismissible claim for false arrest.

### II.  Plaintiffs' Peaceful Demonstration Activity was Protected by the First Amendment, and Defendants are Not Entitled to Qualified Immunity.

#### A.  The First Amendment protects peaceful expression in a public forum.

Taking the facts alleged in the Amended Complaint to be true, the First

Amendment prohibited plaintiffs' arrests, even if their conduct would have been unlawful

under the Blocking Passage statute (which it was not).

The public sidewalk in front of 1090 Vermont Avenue, N.W., is a traditional

public forum.  "[P]ublic places historically associated with the free exercise of expressive

activities, such as streets, sidewalks, and parks, are considered, without more, to be

public forums." *United States v. Grace*, 461 U.S. 171, 177 (1983) (internal quotation

marks omitted); *accord Initiative and Referendum Institute v. U.S. Postal Service*, 417

F.3d 1299, 1313-1314 (D.C. Cir. 2005); *Lederman v. United States*, 291 F.3d 36 (D.C.

Cir. 2002); *Henderson v. Lujan*, 964 F.2d 1179 (D.C. Cir. 1992).[6]  In such a forum, "the government's ability to permissibly restrict expressive conduct is very limited: the government may enforce reasonable time, place, and manner regulations as long as the restrictions are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication."  *Initiative and Referendum Institute,* 417 F.3d at 1305-06 (quoting *Grace*, 461 U.S. at 177) (internal quotation marks omitted).

It cannot plausibly be argued that if the Blocking Passage statute authorized plaintiffs' arrests under the circumstances alleged in the Amended Compliant it would be "narrowly tailored to serve a significant government interest."  This is so for the simple reason that the statute, if so construed, would authorize the arrest of *any* person standing or sitting on *any* sidewalk, once the person had failed to obey the order of a police officer to depart.  It would make the right to communicate peacefully in a public forum — including simply speaking with a friend on the sidewalk — wholly dependent upon the unchecked discretion of every police officer.

Defendants argue that the statute passes muster because it furthers the significant governmental interest in "keeping the public sidewalks open for the safe use and enjoyment by all people," MTD at 18, and is narrowly tailored to serve that interest "by prohibiting individuals from obstructing (or crowding or incommoding) public streets and sidewalks or entrances to buildings."  *Id*. at 19.  That argument makes sense only if the statute is properly construed to prohibit *blocking the sidewalk*.  If the statute is construed to apply to the facts alleged in the Amended Complaint — which involved *no* blocking of

---

[6]  For the purposes of their motion to dismiss, defendants concede that the sidewalk is a traditional public forum.  MTD at 16.

the sidewalk — then the argument is a complete *non sequitur*:  "the statute is narrowly tailored to serve the government in keeping the sidewalks open by prohibiting conduct that does not interfere with keeping the sidewalks open."  Under defendants' reasoning, "if [plaintiffs] had met on one of the spacious sidewalks of Pennsylvania avenue to conduct a peaceable conversation, . . . they would be guilty, under the statute, of crowding and obstructing the free use of the walk," *Hunter v. District of Columbia*, 1918 WL 18180, at *3, and would have no First Amendment defense because the statute is narrowly tailored to serve a significant government interest.

Were defendants' argument sound, the Supreme Court and D.C. Circuit cases cited earlier in this section would have been wrongly decided.  Mary Grace stood on the sidewalk in front of the Supreme Court holding a four-foot by 2½-foot sign with the text of the First Amendment.  *United States v. Grace*, 461 U.S. at 174.  The Supreme Court held that her conduct was protected by the First Amendment, even though it was prohibited by a federal statute — but under defendants' theory she could have been arrested for "blocking passage," even if she blocked no one's passage.  Robert Lederman distributed leaflets on "the sidewalk at the foot of the Senate steps on the Capitol's East Front."  *Lederman v. United States*, 291 F.3d at 39-40.  The D.C. Circuit (affirming this Court) held that his conduct was protected by the First Amendment, even though it was prohibited by a Capitol Police regulation — but under defendants' theory he could have been arrested for "blocking passage," even if he blocked no one's passage.  David Henderson attempted to distribute Christian evangelist leaflets "on city sidewalks near the Vietnam Veterans Memorial wall."  *Henderson v. Lujan*, 964 F.2d at 1180.  The D.C. Circuit held that his conduct was protected by the First Amendment, even though it was

prohibited by a National Park Service regulation — but under defendants' theory he could have been arrested for "blocking passage," even if he blocked no one's passage. The plaintiffs in *Initiative and Referendum Institute* sought to collect signatures on petitions on Post Office sidewalks.  417 F.3d at 1303.  The D.C. Circuit held that their conduct was protected by the First Amendment when they were on public forum sidewalks, even though it was prohibited by a Postal Service regulation, *id*. at 1312 — but under defendants' theory they could be arrested for "blocking passage," even if they blocked no one's passage.

Defendants are wrong, because a statute that prohibits not just the actual blocking of passage but merely being present on a sidewalk — which is how defendants must construe the Blocking Passage statute to make it apply to plaintiffs' conduct — is not narrowly tailored to serve any legitimate purpose.  *See Initiative and Referendum Institute,* 417 F.3d at 1307-08 (explaining why the Postal Service regulation at issue in that case, as applied to public forum sidewalks, was not narrowly tailored).

## B.  Defendants are not entitled to qualified immunity.

Defendants are not entitled to qualified immunity on plaintiffs' First Amendment claims.  No reasonable police officer could have believed that it was permissible to arrest plaintiffs on a theory flatly inconsistent with the binding teaching of *Grace, Lederman, Henderson*, and *Initiative and Referendum Institute.*

Defendants cite two cases in support of their assertion that it is not clearly established "that an individual may not be arrested unless he or she is completely blocking" a sidewalk, MTD at 49, but those cases are of no help to defendants given the facts alleged in the Amended Complaint.

Defendants' first case is *Tetaz v. District of Columbia*, 976 A.2d 907 (D.C. 2009). We have already shown why that case is of no help to defendants: the persons arrested in *Tetaz* were, in fact, blocking an entrance to the Rayburn House Office Building.  *See* p. 6, above.  Defendants' second case is *White v. City of Laguna Beach*, 679 F. Supp. 2d 1143 (C.D. Cal. 2010).  *White* is also of no help to defendants: the court in that case found as a fact that Mr. White and his companions did obstruct and impede the free flow of pedestrian traffic on a "heavily congested" sidewalk in Laguna Beach on an "extremely busy" Fourth of July weekend.  *Id*. at 1153.  It is true that Mr. White and his companions occupied only 30 to 40% of the sidewalk, but given the pre-existing heavy congestion, that was enough to interfere with others' use of the sidewalk.  *Id*.  *White* therefore provides no support for defendants' argument here that demonstrators who are passively occupying about 6% of a wide, uncongested sidewalk can constitutionally be arrested. Indeed, the court in *White* recognized that "if, at the time of the demonstration, the sidewalk was empty or only lightly trafficked [the statute] might not be considered narrowly tailored to promote the free flow of traffic on the sidewalk." *Id*.[7]

Nor does the allegation that the arresting officers were "told" by other MPD officers, who in turn had been "advised" by unknown "attorneys in the Office of the Attorney General" that plaintiffs could be arrested, MTD at 48 (citing Amended Complaint ¶ 83), change that conclusion.  As this Court has made clear, "Defendants are charged with knowledge of clearly established principles governing their conduct."

---

[7]  In any event, a decision of the U.S. District Court for the Central District of California cannot render unsettled, in the District of Columbia, law that has been clearly established by the U.S. Supreme Court and the D.C. Circuit.  *See Johnson v. District of Columbia*, 528 F.3d 969, 976 (D.C. Cir. 2008) ("In determining whether officers strayed beyond clearly established bounds of lawfulness, we look to cases from the Supreme Court and this court, as well as to cases from other courts exhibiting a consensus view.").

*McDonald v. Salazar*, 831 F. Supp. 2d 313, 330 (D.D.C. 2011) (Roberts, J.).  "Ignorance of the law is not a defense, since a '"reasonably competent public official should know the law governing his conduct."'"  *Id*. at 325 (quoting *Barham v. Ramsey*, 338 F. Supp. 2d 48, 55 (D.D.C. 2004)) (in turn quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818-19 (1982)).  If attorneys in the Office of the Attorney General advised police officers that they could arrest someone for writing a novel, and the officers did so, they would not be entitled to qualified immunity.  *Cf. Eberhardt v. O'Malley*, 17 F.3d 1023, 1028 (7th Cir. 1994) (Posner, J.).  This case is no less clear.

## CONCLUSION

For the reasons stated above, defendants' motion to dismiss Counts I (false arrest), IV (First Amendment), and V (Fourth Amendment) of the Amended Complaint should be denied.[8]

Respectfully submitted,

*Arthur B. Spitzer*
Arthur B. Spitzer (D.C. Bar No. 235960)
American Civil Liberties Union
 of the Nation's Capital
4301 Connecticut Avenue, N.W., Suite 434
Washington, DC 20008
Telephone: (202) 457-0800
Facsimile: (202) 457-0805
artspitzer@aclu-nca.org

May 12, 2013

---

[8]  *Amicus* expresses no view on the claims and defenses that are not discussed in this memorandum.